NOT DESIGNATED FOR PUBLICATION

No. 110,391

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL D. NELOMS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; JOHN J. KISNER, JR., judge. Opinion filed February 5, 2016. Affirmed in part, vacated in part, and remanded with directions.

*Michael P. Whalen* and *Krystle Dalke*, of Law Office of Michael P. Whalen, of Wichita, for appellant.

*Matt J. Maloney*, assistant district attorney, *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before MALONE, C.J., PIERRON, J., and WALKER, S.J.

*Per Curiam*: A jury found Michael Neloms guilty of aggravated human trafficking, promoting prostitution, and one count of aggravated indecent liberties with a child. In this direct appeal, he argues: (1) the district court erred by denying his motion to suppress statements; (2) the district court violated his due process rights by allowing the State during the trial to amend the complaint and add the alternative charge of promoting prostitution; (3) the district court erred by convicting him of aggravated human trafficking rather than the more specific crime of promoting prostitution; (4) the

aggravated human trafficking statute is unconstitutionally overbroad as applied in this case; (5) the aggravated human trafficking statute is unconstitutionally vague; (6) the district court erred by failing to instruct the jury on the definition of the word "used" in the context of aggravated human trafficking; (7) the district court erred by allowing the State to introduce a handwritten "novella" found in Neloms' home; (8) the district court violated his constitutional right to conflict-free counsel by failing to adequately inquire into a potential conflict between Neloms and appointed counsel; and (9) the district court imposed an illegal sentence. We agree with Neloms, in part, on the sentencing issue, but we otherwise affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On May 28, 2011, Brandon Dodd was working at the front desk of a Motel 6 in Wichita. Denisha Starnes came in and rented a room, but Dodd noticed additional people in the car in which she had arrived. Because the motel had problems with people renting rooms for others or having unauthorized people in their rooms, Dodd was paying close attention. He saw Starnes and a white female, later identified as 15-year-old M.M., go up to the motel room. Approximately 30 minutes later, a man arrived and one of the women came out and took the man back to the room.

Dodd suspected prostitution, so he searched the internet for the phone number Starnes had given when renting the room; the phone number was related to an escort service. Dodd called the police to come evict the people from the motel room. Officer Thomas Grindley of the Wichita Police Department responded to the call and saw Starnes and Arianna Parks sitting in a car outside the motel. The two young women told Grindley they were there to pick up a friend, but because they were vague about the friend's identity and why they were waiting in the parking lot, Grindley suspected prostitution. When other officers went into the room, they found M.M. and a man. The officers arrested M.M. for prostitution, but the charges were later dropped.

2

The following day, Officer Kent Bauman interviewed M.M. at the police station. M.M., who told Bauman that her nickname was T.T., said that Parks and Starnes had driven her to the motel, where she had sex with and was paid by a man she had arranged to meet there for that purpose. The man had contacted her in response to a posting she made on a website called Backpage, which is often used to advertise prostitution. Bauman later testified that M.M. told him that Neloms had taken the photographs she used in the advertisement and had posted the advertisement on Backpage.

M.M. told Bauman that she was a runaway and had met Neloms when he said hello to her as she was walking down the street by his home. He introduced her to Starnes and Parks, who were his sisters. M.M. admitted that she had sex with Neloms two or three times and that the first time had been in early April 2011. When Bauman asked M.M. if Neloms was her pimp, she said no.

Stacie Frobenius, a crime scene investigator with the Wichita Police Department, processed the motel room on May 29, 2011. She photographed the room, collected evidence, and swabbed a used condom found in the room. She later submitted the swabs for DNA testing. Later that day, Wichita police officer Steven Drzymalla went to Neloms' home, spoke with him, and took him into custody. Police searched Neloms' home and seized evidence, including a blue duffel bag and some binders, or portfolios, found in one of the bedrooms.

Detective Virgil Miller of the Wichita Police Department's Exploited and Missing Children's Unit examined one of the portfolios seized from Neloms' home. Miller found a high school identification card for M.M., two cell phone cards and instruction manuals, Neloms' social security card, Neloms' Vision card, and a photocopy of Parks' identification card. In an inside section of the portfolio, Miller found more papers, including a stack of documents topped by a drawing and the title "Bottom Bitch." The term "Bottom bitch" is commonly used in the prostitution trade for a prostitute who is

3

second in command to a pimp. Miller also collected DNA swabs from Neloms. When DNA analysis was completed, the results showed that the outside of the condom from the motel room had sperm cell fractions consistent with Neloms as a minor contributor.

On May 29, 2011, Miller interviewed Neloms. Neloms told Miller that he had met M.M. in February or March of 2011 and that she had told him she was 19 years old. Neloms admitted that he had sex twice with M.M., who he also called T.T., but Neloms claimed that when he learned she was 15 years old, he did not have sex with her again. Neloms stated that he did not know his sisters were involved in prostitution and, if he had known, he would have been upset with them. Neloms repeatedly denied profiting from M.M.'s prostitution or placing any Backpage advertisements for her. After further investigation, Miller learned that the Backpage advertisements had been paid for with a credit card in Neloms' mother's name; M.M. later confirmed that she had paid for the advertisements with Neloms' mother's credit card. That credit card had been found in Neloms' pocket when Drzymalla took him into custody.

The State charged Neloms with one count of aggravated human trafficking and two counts of aggravated indecent liberties with a child. The district court appointed counsel to represent Neloms and over the course of pretrial proceedings, Neloms filed multiple pro se motions for dismissal of counsel. The district court heard the motions and granted the fourth one, appointing new counsel.

In November 2011, Neloms filed a motion in limine objecting, among other things, to the admission of statements he had made during the investigation of the case. In May 2012, he filed a second motion in limine, again arguing that the statements were inadmissible. Both motions alleged that the statements were involuntary. The district court reviewed the videotape of the police interview and denied the motion to suppress.

4

The jury trial began on February 5, 2013. The State presented testimony from Dodd, Grindley, and M.M. In her testimony, M.M. admitted that she had engaged in prostitution and that she had advertised on Backpage. She stated that she began engaging in prostitution in January 2011, prior to meeting Neloms. M.M. testified that from January until April or May 2011, she had worked for a pimp named Chris, but after that she worked independently.

M.M. testified that Neloms did not provide her a phone to arrange prostitution, nor did he tell her how to post on Backpage. Backpage charged a fee to post and M.M. used Starnes' mother's credit card, which she testified "everybody used" because it "was just floating around." Neloms lived with Starnes, Parks, their mother, and Parks' son. If Neloms had possession of the card when M.M. needed it, she would get the card from him. M.M. acknowledged her testimony at a previous hearing that Neloms knew that she used the credit card to advertise on Backpage.

M.M. did not have a driver's license. She testified that Starnes and Parks sometimes drove her to meetings with johns—the men who paid her for sex—and M.M. gave them gas money. M.M. testified that Neloms drove her once to see a john, but she was unsure whether Neloms knew that was the purpose of the trip. M.M. admitted that at a previous hearing she had testified that when she needed Starnes or Parks to give her a ride to meet a john, she would either ask them or ask Neloms to ask them. M.M. also admitted that she had called Neloms for help once when she was afraid of a john. Neloms came to help, but the john left before he arrived.

Regarding her sexual relationship with Neloms, M.M. testified inconsistently. She first testified that she never had sex with Neloms, then testified that she did not remember having sex with him but she could have, then testified that she did not "remember having sex with him the first time." She acknowledged, however, that at a prior hearing, she had testified that she had sex with Neloms more than twice and at least once after she turned

5

15 years old. On cross-examination, she testified she did not think she had sex with Neloms and she felt her prior testimony was untrue because she "[felt] like [she] would remember sleeping with him."

M.M. testified that on the night she was arrested for prostitution, she was staying with her friend Victoria, but Starnes and Parks later gave her a ride to the Motel 6. She testified that she was meeting a john who had contacted her because of the Backpage advertisement she had posted using Neloms' mother's computer and credit card. At the motel, Starnes paid to rent the room because M.M. was not old enough to do so. M.M. had sex with the john, and he paid her $100.

M.M. testified that she did not work for Neloms, she did not give him a percentage of her earnings, and she did not feel that he was her pimp. M.M. took calls in response to her Backpage advertisements, she set up meetings with johns, and she set the prices. Neloms did not pay for the motel room. M.M. admitted that she had told the john on the night in question that she had a pimp. M.M. also admitted that she and Starnes had a conversation in December 2011 about how Starnes was going to tell law enforcement that she was M.M.'s pimp, not Neloms, so that Neloms would no longer be in trouble.

The State called Bauman who testified about his interview with M.M. and also explained some terminology of the sex trade to the jury. He defined a "john" as "somebody who goes out and pays for sex [with] a prostitute," a "pimp" as "the person who is the sex trafficker," and a "bottom bitch" or "bottom girl" as a prostitute who is "second in command and kind of runs the show while [the pimp] is gone."

The State also presented testimony from Frobenius, Drzymalla, a crime scene investigator who helped search Neloms' home, the forensic scientist who conducted the DNA analysis, and Miller. In conjunction with Miller's testimony, the State introduced

into evidence the stack of papers called "Bottom Bitch," including a sexually explicit story whose narrator was a pimp. Neloms did not present any evidence at the trial.

After the evidence was presented, the State amended the information to add a count of promoting prostitution in the alternative to the count of aggravated human trafficking. The jury found Neloms guilty of aggravated human trafficking, promoting prostitution, and one count of aggravated indecent liberties with a child and acquitted him on the second count of aggravated indecent liberties with a child. The district court did not convict Neloms of promoting prostitution, however, because it was charged as an alternative to aggravated human trafficking.

Neloms filed a motion for new trial. On April 10, 2013, Neloms filed a pro se motion to dismiss counsel. The following day, the district court sentenced Neloms to 620 months' imprisonment for aggravated human trafficking and 59 months' imprisonment for aggravated indecent liberties with a child, with the sentences to run concurrently. The district court imposed lifetime postrelease supervision for each conviction. Neloms timely appealed the district court's judgment.

MOTION TO SUPPRESS STATEMENTS

Neloms first argues that the district court erred when it denied his motion to suppress statements he made to Miller. As a threshold matter, however, the State claims that this issue is not properly before this court because Neloms failed to object to the admission of the statements at trial.

Prior to trial, Neloms filed two motions in limine that challenged statements he made during a police interview with Miller. Without much explanation, he argued that the statements were involuntary. The district court addressed the issue at two pretrial

7

hearings, considering additional argument and testimony from Neloms. The district court took the matter under advisement in order to review the videotape of the interview.

On February 11, 2013, the district court filed an order denying Neloms' motion to suppress the statements. The district court specifically found that Neloms had freely and voluntarily made the statements after a knowing and intelligent waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). After the trial began but prior to Miller testifying about his interview with Neloms, Neloms asked the district court to remind Miller "of the order in limine because there were a lot of things that were brought up during the interview and I would ask that he be reminded there are certain areas he's not to talk about." The State agreed to do so, and Miller proceeded to testify at trial that Neloms had admitted to having sex with M.M. Neloms made no objection to this testimony during the trial.

Neloms now argues that the district court's denial of his motion to suppress was error. But as the State points out, Neloms has failed to preserve this issue for appeal.

> "Under K.S.A. 60-404, 'a party must lodge a timely and specific objection to the admission or exclusion of evidence in order to preserve the evidentiary question for review.' *State v. King*, 288 Kan. 333, 348, 204 P.3d 585 (2009). . . . 'Because an in limine ruling "is subject to change when the case unfolds," [citation omitted] a pretrial objection must be contemporaneously renewed during trial or preserved through a standing objection.' [Citation omitted.]" *State v. Richard*, 300 Kan. 715, 720-21, 333 P.3d 179 (2014).

Neloms argues that his request that Miller be reminded of the limits on his testimony satisfies the contemporaneous objection requirement because the motion in limine had asked that Neloms' interview statements be suppressed. This argument fails because the district court *denied* that portion of the motion in limine. The district court placed no restrictions on Miller's testimony concerning his interview with Neloms.

8

Accordingly, there was no court-imposed limitation on that testimony about which to remind Miller. Neloms' pretestimony request to remind Miller of the ruling on the motion in limine did not preserve this issue for appeal.

Neloms also contends that this court should address the issue on its merits because it "involve[s] facts that are not in dispute and made from a fully developed record and is necessary to prevent a denial of a constitutional right." Neloms bases his argument on recognized exceptions to the general rule that this court will not consider issues for the first time on appeal. See *State v. Swint*, 302 Kan. 326, 335, 352 P.3d 1014 (2015) (identifying rule and listing exceptions). Our Supreme Court has rejected this argument:

> "[W]e have applied the timely and specific objection requirement even in cases where an evidentiary claim involved a defendant's constitutional rights. [Citation omitted.] We have held that if we were to overlook the lack of objection in such circumstances, 'these and other caselaw exceptions would soon swallow the general statutory rule.' [Citation omitted.]" *State v. Moore*, 302 Kan. ___, ___, 357 P.3d 275, 286 (2015).

Stated differently, there are three exceptions to the general rule that an appellate court will not consider *issues* for the first time on appeal. However, none of these exceptions trumps the contemporaneous objection requirement under K.S.A. 60-404 in order to preserve an evidentiary issue for appeal.

Our Kansas Supreme Court has made it clear that a party must lodge a contemporaneous objection at trial in order to preserve an evidentiary issue for appeal. See *King*, 288 Kan. at 348. The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *State v. Vrabel*, 301 Kan. 797, 809-10, 347 P.3d 201 (2015). There is no indication that our Supreme Court is reconsidering its position on this rule. Thus, we conclude that Neloms has failed to preserve this issue for appeal.

9

Next, Neloms argues that the district court violated his due process rights by allowing the State to amend the complaint after the close of evidence at trial to add the alternative charge of promoting prostitution, a new crime, which caused Neloms prejudice. The State argues that this claim is meritless because the same evidence supported both crimes and Neloms suffered no prejudice from the amendment.

Just prior to beginning jury selection, the State moved to amend the complaint to charge promoting prostitution as an alternative to aggravated human trafficking. Neloms objected, arguing that he had built his defense around the charge of aggravated human trafficking, so allowing the State to amend the charges on the morning of trial would be unfairly prejudicial. The district court took the request under advisement. After the close of evidence, the district court granted the State's motion, finding that there was "enough evidence to support both the alternative counts and . . . the proper way to proceed is to present both those counts to the jury." Accordingly, the State filed an amended information, charging one count of aggravated human trafficking or, in the alternative, one count of promoting prostitution, as well as two counts of aggravated indecent liberties with a child.

K.S.A. 22-3201(e) states:  "The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced." This court reviews the decision to allow an amendment for an abuse of discretion, which the defendant bears the burden to establish. *State v. Holman*, 295 Kan. 116, 145, 284 P.3d 251 (2012). The district court abuses its discretion if no reasonable person would take the district court's view. 295 Kan. at 145.

Our Supreme Court has explained that even "the charging of a different crime may be allowed via an amended complaint before trial, provided the substantial rights of the defendant are not prejudiced." *State v. Bischoff*, 281 Kan. 195, Syl. ¶ 7, 131 P.3d 531 (2006); see also *State v. Calderon-Aparicio*, 44 Kan. App. 2d 830, 847, 242 P.3d 1197 (2010), *rev. denied* 291 Kan. 914 (2011). *Bischoff* speaks directly to pretrial amendments, but the principle applies to midtrial amendments as well, as this court has noted. In *State v. Spangler*, 38 Kan. App. 2d 817, 824, 173 P.3d 656 (2007), while reviewing an amendment of a complaint made just before the completion of the State's case at trial, this court recognized that when considering the amendment of a complaint or information "at any time before verdict," prejudice is the controlling factor.

Neloms argues that the amendment prejudiced him because he had prepared a defense to the charge of aggravated human trafficking, a crime distinct from promoting prostitution, and the amendment occurred during the trial. While generally asserting that the late amendment prejudiced his ability to defend against promoting prostitution, Neloms offers no specific explanation of how the late amendment hindered him. On the other hand, the State persuasively asserts that Neloms' defense was equally effective as a defense to both charges. As Neloms said in his opening statement, the defense theory was "that [M.M.] was what she was and it had nothing to do with Mr. Neloms." If the jury had believed this defense, it would have acquitted Neloms of aggravated human trafficking *and* promoting prostitution.

Most significantly, adding the charge of promoting prostitution did not prejudice Neloms because although the jury found him guilty of the alternative charge, the district court did not convict him of the crime or sentence him for it. Instead, the district court sentenced Neloms only for his conviction of aggravated human trafficking. Essentially, Neloms' claim on appeal is moot. There was no actual prejudice as a result of the amendment. Accordingly, Neloms' argument fails.

11

## Is Promoting Prostitution the More Specific Crime of Aggravated Human Trafficking?

Next, Neloms contends that the district court erred by entering a conviction for aggravated human trafficking when the State's evidence supported a conviction for the more specific crime of promoting prostitution. Neloms and the State both acknowledge that our Supreme Court rejected a similar argument in *State v. Williams*, 299 Kan. 911, 928-33, 329 P.3d 400 (2014). Neloms strives to distinguish his situation from that in *Williams*, while the State points out the similarities.

The rule "that a general statute should yield to a more specific statute covering the same criminal" conduct is a rule of statutory interpretation courts use to determine which statute the legislature intended to apply in particular circumstances. 299 Kan. at 930. Whether this rule applies is a question of law over which this court exercises unlimited review. 299 Kan. at 930. Although a general statute normally must yield to a specific statute covering the same criminal conduct, the rule "'must yield where there is a clear indication that the legislature did not intend for one statute to be the exclusive mechanism for punishing a given activity.' [Citations omitted.]" 299 Kan. at 930.

The controlling case, *Williams*, went before our Supreme Court on a petition for review of a decision from this court in which this court had used alternative means analysis to determine whether the defendant should have been convicted of promoting prostitution. See 299 Kan. at 916, 928. The *Williams* court recognized that if it also engaged in alternative means analysis, it would have to follow a different analytical procedure than this court did, due to changes in the approved analysis of alternative means issues. 299 Kan. at 930. The *Williams* court concluded: "We need not sort out all of these arguments and developments, however, because we conclude there is a more straightforward answer: The legislative intent was not to have promoting prostitution control over aggravated trafficking." 299 Kan. at 930.

12

Legislative history showed that the legislature was aware "there would be overlap between aggravated trafficking and other criminal offenses but were told the comprehensive aggravated trafficking provision was needed." 299 Kan. at 931. In reviewing this and other legislative history, the *Williams* court held that the legislature's action was "indicative of the intent to cover a wide range of activities." 299 Kan. at 931-32. Applying that conclusion to the issue before it, the *Williams* court stated: "Although the State's evidence may have been sufficient to sustain a charge against Williams for promoting prostitution, his conduct went beyond the behaviors targeted by that provision and more clearly fall within the scope of conduct the legislature intended to criminalize through the aggravated trafficking statute." 299 Kan. at 932.

A finding that promoting prostitution was a more specific offense of aggravated human trafficking would allow an individual who traffics minors for prostitution to serve a shorter sentence than an individual who traffics minors for other sexual exploitation. 299 Kan. at 933. As the *Williams* court recognized, "[I]t flies in the face of logic to assume the legislature intended to afford less protection to those minors trafficked for prostitution than those trafficked for other forms of sexual exploitation, especially given a legislative record replete with testimony about traffickers luring young girls into prostitution rings." 299 Kan. at 933. Accordingly, the *Williams* court held that under the facts of the case, promoting prostitution was not a more specific crime. 299 Kan. at 933.

Neloms attempts to distinguish his case from *Williams* by pointing out factual dissimilarities: M.M. did not give the money she earned to Neloms, he did not set her prices, she was free to move around at her will, etc. Neloms contends that these examples illustrate that the exploitation present in *Williams* was not present here.

When read carefully, however, *Williams*' analysis does not lend itself to fact-specific, case-by-case application. In *Williams*, our Supreme Court held that the legislature did not intend for promoting prostitution to be a more specific offense of

13

aggravated human trafficking. The legislative history included explicit discussion of human trafficking in the context of prostitution, and it does not make sense to conclude that the legislature intended to punish people guilty of trafficking minors for prostitution less severely than those guilty of trafficking minors for other sexual exploitation. Because *Williams* held that promoting prostitution is not a more specific offense of aggravated human trafficking, Neloms' argument to the contrary must fail. See *Vrabel*, 301 Kan. at 809-10 (Court of Appeals is duty bound to follow Kansas Supreme Court precedent).

IS AGGRAVATED HUMAN TRAFFICKING STATUTE UNCONSTITUTIONALLY OVERBROAD?

Next, Neloms asserts that the aggravated human trafficking statute is unconstitutionally overbroad as applied to his case. He concedes that he did not raise this claim in the district court and that constitutional issues are not properly raised for the first time on appeal, except under certain circumstances. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Neloms argues that two exceptions to this general rule apply: (1) the issue involves only a question of law and is finally determinative of the case and (2) review is necessary to prevent the denial of a fundamental right.

Our Supreme Court previously has addressed an overbreadth argument for the first time on appeal in order to prevent the denial of a fundamental right. See *State v. Zabrinas*, 271 Kan. 422, 427, 24 P.3d 77 (2001). Following this lead, we will consider Neloms' constitutional claim for the first time on appeal.

> "Whether a statute is constitutional is a question of law subject to unlimited review. [Citation omitted.] This court presumes that statutes are constitutional and resolves all doubts in favor of passing constitutional muster. If there is any reasonable way to construe a statute as constitutionally valid, this court has both the authority and duty to engage in such a construction. [Citation omitted.]" *State v. Bollinger*, 302 Kan. 309, 318, 352 P.3d 1003 (2015).

14

Our Supreme Court has explained the nature of an unconstitutionally overbroad statute:

"Where conduct and not merely speech is involved, the United States Supreme Court requires that 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep.' [Citation omitted.] [Our Supreme Court] has divided this burden into a two-part test. The party attacking the constitutionality of a statute on the basis of overbreadth must establish '(1) the protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications.' [Citation omitted.]" *Williams*, 299 Kan. at 920.

The statute in question here, K.S.A. 2010 Supp. 21-3447(a)(2), prohibits aggravated human trafficking, which is committed by "recruiting, harboring, transporting, providing or obtaining, by any means, a person under 18 years of age knowing that the person, with or without force, fraud, threat or coercion, will be used to engage in forced labor, involuntary servitude or sexual gratification of the defendant or another." In *Williams*, our Supreme Court rejected the argument that the statute was unconstitutionally overbroad on its face. See 299 Kan. at 919-24.

Neloms acknowledges this holding and attempts to avoid it by characterizing his claim as an as-applied challenge. He first claims that the statute "failed to provide fair warning that [his] behavior fell within the confines of the law." But this argument goes to the vagueness of a statute, not its breadth. See *State v. McCune*, 299 Kan. 1216, 1235, 330 P.3d 1107 (2014) ("[A] statute is unconstitutionally vague when it fails to give adequate warning as to the proscribed conduct. [Citation omitted.]").

Neloms next contends that the aggravated human trafficking statute prohibits the constitutionally protected conduct of speech, travel, and association through its language prohibiting "recruiting, . . . transporting, providing or obtaining" a minor knowing that

15

the minor "will be used to engage in . . . sexual gratification of the defendant or another." See K.S.A. 2010 Supp. 21-3447(a)(2). He claims that these prohibitions could prohibit "association and speech with [M.M.] if he helps her out by any means and is aware that she may borrow his house, car, computer, money to aid her own prostitution endeavors."

There are several problems with Neloms' argument. First, in an as-applied challenge, Neloms must restrict his challenge to his circumstances. Because he was convicted under the provision of the aggravated human trafficking statute that prohibits "transporting," it is the only relevant provision at issue. See *Cross v. Kansas Dept. of Revenue*, 279 Kan. 501, 507-08, 110 P.3d 438 (2005) (holding that as-applied argument may only challenge statute's constitutionality "insofar as it has an adverse impact on his own rights"). Second, Neloms does not identify any constitutional provision that protects his actions. Simply put, transporting a minor with the knowledge that she will be used for the sexual gratification of another is not a constitutionally protected right.

Third, Neloms' arguments regarding the level or lack of exploitation present in his relationship with M.M. appear immaterial to the question of overbreadth and Neloms does not explain their relevance. Finally, the arguments that Neloms raises are identical to those rejected in *Williams*, and this court is duty-bound to follow Kansas Supreme Court precedent. See *Vrabel*, 301 Kan. at 809-10.

As stated above, the test for whether a statute is unconstitutionally overbroad is whether "'(1) [constitutionally] protected activity is a significant part of the law's target, and (2) there exists no satisfactory method of severing that law's constitutional from its unconstitutional applications.' [Citation omitted.]" See *Williams*, 299 Kan. at 920. Neloms has failed to show that the statute targeted or hindered his engaging in any constitutionally protected activity. Therefore, his challenge fails.

IS AGGRAVATED HUMAN TRAFFICKING STATUTE UNCONSTITUTIONALLY VAGUE?

Next, Neloms contends that the aggravated human trafficking statute is unconstitutionally vague. Neloms concedes that he did not argue vagueness in the district court, but he again argues that the issue involves only a question of law and is finally determinative of the case and review is necessary to prevent the denial of a fundamental right. We will consider the merits of Neloms' claim based on those exceptions.

"Whether a statute is constitutional is a question of law subject to unlimited review. [Citation omitted.] This court presumes that statutes are constitutional and resolves all doubts in favor of passing constitutional muster. If there is any reasonable way to construe a statute as constitutionally valid, this court has both the authority and duty to engage in such a construction. [Citation omitted.]

"A statute is unconstitutionally vague if it fails to give adequate warning of the proscribed conduct, that is to say, that it '"fails to provide a person of ordinary intelligence fair notice of what is prohibited."' [Citation omitted.] A statute is also unconstitutionally vague if it fails to protect against arbitrary enforcement. [Citation omitted.] Violation of either aspect of these predictability requirements is grounds for invalidating a statute. [Citation omitted.]

"Thus, the test to determine whether a criminal statute is so vague as to be unconstitutional entails two related inquiries: (1) whether the statute gives fair warning to those potentially subject to it, and (2) whether it adequately guards against arbitrary and unreasonable enforcement. [Citation omitted.] 'At its heart the test for vagueness is a commonsense determination of fundamental fairness.' [Citation omitted.]" *Bollinger*, 302 Kan. at 318.

K.S.A. 2010 Supp. 21-3447(a)(2), prohibits aggravated human trafficking, which is committed by "recruiting, harboring, transporting, providing or obtaining, by any means, a person under 18 years of age knowing that the person, with or without force, fraud, threat or coercion, will be *used* to engage in forced labor, involuntary servitude or *sexual gratification* of the defendant or another." (Emphasis added.) Neloms asserts that the statute is unconstitutionally vague because it does not adequately define the terms

17

"used" and "sexual gratification." As the State notes, however, our Supreme Court has rejected this argument with respect to the word "used."

In *Williams*, despite first holding that the defendant did not have standing to argue that the aggravated human trafficking statute was unconstitutionally vague, our Supreme Court addressed as part of its overbreadth analysis the vagueness argument with regard to the statute's failure to define "used." See 299 Kan. at 919, 921. The *Williams* court explicitly concluded that "the word's context makes its meaning clear, and its meaning limits the scope of K.S.A. 21-3447(a)(2). Specifically, the phrase 'used to engage in forced labor, involuntary servitude or sexual gratification' indicates the statute is limited to situations where a minor has been exploited." 299 Kan. at 921.

Neloms also argues that the failure to define "sexual gratification" renders the statute unconstitutionally vague. This court previously has rejected this argument. See *State v. Williams*, 46 Kan. App. 2d 36, 44-45, 257 P.3d 849 (2011), *aff'd on other grounds* 299 Kan. 911, 329 P.3d 400 (2014). The panel stated:

"Williams is correct that K.S.A. 21-3447 does not expressly define the term 'sexual gratification.' However, we may look at how the term has been used in other contexts within the Kansas statutes for guidance. The Kansas Offender Registration Act requires those who have committed certain specified sex offenses to register on publicly available lists. See K.S.A. 2010 Supp. 22-4902; K.S.A. 2010 Supp. 22-4904(a)(1). A sex offender includes a person convicted of a 'sexually violent crime.' K.S.A. 2010 Supp. 22-4902(b)(c). A 'sexually violent crime' includes certain specified crimes, as well as

"'any act which at the time of sentencing for the offense has been determined beyond a reasonable doubt to have been sexually motivated. As used in this subparagraph, "sexually motivated" means that one of the purposes for which the defendant committed the crime was for the purpose of the defendant's sexual gratification.' K.S.A. 2010 Supp. 22-4902(c)(16).

"The term 'gratify' is defined as 'to please or satisfy.' Webster's II New College Dictionary 486 (1999). Our court has had no difficulty in determining that certain crimes

18

were committed for a defendant's sexual gratification. See, *e.g., State v. Gallardo*, 43 Kan. App. 2d 346, 352, 224 P.3d 1192 (2010) (finding that conviction for unlawful sexual relations was committed for defendant's sexual gratification); *State v. Chambers,* 36 Kan. App. 2d 228, 240, 138 P.3d 405, *rev. denied* 282 Kan. 792 (2006) (finding that conviction of burglary was committed for defendant's sexual gratification where defendant broke into residences for the sole purpose of stealing women's lingerie to facilitate masturbation); *State v. Lopez,* 25 Kan. App. 2d 777, 778, 973 P.2d 802 (1998), *rev. denied* 266 Kan. 1113 (1999) (finding that crime of attempted aggravated burglary was sexually motivated where victim awoke in the middle of the night to find defendant standing over her naked); *State v. Patterson,* 25 Kan. App. 2d 245, 251, 963 P.2d 436, *rev. denied* 265 Kan. 888 (1998) (finding that conviction of burglary and theft in connection with stealing woman's underwear was sexually motivated where defendant kept the underwear in a locked cabinet containing pornographic material). As demonstrated by these decisions, the absence of a specific definition in K.S.A. 21-3447 does not force a person of ordinary intelligence to guess as to the meaning of the term 'sexual gratification.'" *Williams*, 46 Kan. App. 2d at 44-45.

We find this reasoning to be sound and we adopt this reasoning to deny Neloms' claim that the term "sexual gratification" renders the statute unconstitutionally vague. For these reasons, Neloms' vagueness claims fail.

## JURY INSTRUCTION ON AGGRAVATED HUMAN TRAFFICKING

Next, Neloms contends that the district court erred in failing to instruct the jury that, in the aggravated trafficking statute, the word "used" means "exploited through an abuse of power." Neloms claims that there was a very real possibility that if the district court had so instructed the jury, the jury would have acquitted him. The State argues that the wording of the statute makes the meaning of "used" clear, so there was no need to instruct the jury on the definition.

19

Neloms concedes that he did not request the definitional instruction in the district court. Therefore, as both parties acknowledge, this court reviews for clear error. See *State v. Brammer*, 301 Kan. 333, 341, 343 P.3d 75 (2015).

> "'To determine whether an instruction or a failure to give an instruction was clearly erroneous, the reviewing court must first determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.
>
> "'If the reviewing court determines that the district court erred in giving or failing to give a challenged instruction, then the clearly erroneous analysis moves to a reversibility inquiry, wherein the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.' [Citation omitted.]" *State v. Smith-Parker*, 301 Kan. 132, 163-64, 340 P.3d 485 (2014).

The district court instructed the jury that in order to find Neloms guilty of aggravated human trafficking, the State had to prove that Neloms "transported a person under 18 years of age knowing that the person, with or without force, fraud, threat, or coercion, would be used to engage in sexual gratification of the defendant or another." Neloms contends that the district court should have instructed the jury that "used" meant "exploited through an abuse of power." He bases this argument on our Supreme Court's holding in *Williams*, 299 Kan. at 921, that the context of the word "used" in the aggravated human trafficking statute "makes its meaning clear, and its meaning limits the scope of K.S.A. 21-3447(a)(2). Specifically, the phrase 'used to engage in forced labor, involuntary servitude or sexual gratification' indicates the statute is limited to situations where a minor has been exploited. [Citation omitted.]"

Neloms contends that a jury likely would not know that this is the intended meaning of the word "used" without instruction from the district court and that since the

court did not define "used" for the jury, the jury did not understand the limitations of the statute. Our Supreme Court has held:

> "[A] trial court 'need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined.' [Citation omitted.] . . . '[A] term which is widely used and which is readily comprehensible need not have a defining instruction.' [Citation omitted.]" *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014).

The *Williams* court held that the context of the word "used" within the statute made its meaning clear. 299 Kan. at 921. Although *Williams* examined "used" as part of a challenge based on the statute's purported unconstitutional vagueness, the holding is applicable here as well. If the meaning of the word "used" in the statute is clear from its context for purposes of vagueness analysis, it is also readily comprehensible by a jury and does not need a defining instruction. Thus, the district court did not err in failing to *sua sponte* define "used" for the jury. See *State v. Thomas*, No. 111,621, 2015 WL 4094260, *5-6 (Kan. App. 2015) (unpublished opinion) (rejecting argument that district court should have instructed jury on definition of "used" in an aggravated human trafficking prosecution), *rev. denied* 303 Kan. ___ (December 14, 2015).

## EVIDENTIARY ISSUE

Next, Neloms argues that the district court erred by allowing into evidence a novella allegedly written by Neloms. To fully appreciate the argument, additional background facts are necessary.

During the trial, outside the jury's presence, the State informed the district court that the following morning it intended to introduce into evidence what the State called a novella, entitled "Bottom Bitch," which was part of papers Miller discovered in a portfolio found in Neloms' home. In addition to the novella, the proposed exhibit also

21

included (1) copies of M.M.'s high school identification card; (2) copies of the packaging for cell phones; (3) copies of a Vision card, Neloms' social security card, a skylight card, and a foot locker VIP card; (4) a copy of Parks' Kansas identification card; (5) a list titled "Bargain Books" of books on sex, business, and pimping; (6) a disclaimer page stating that contacting the author by phone constituted an agreement that the reader was not a member of any law enforcement agency and that any donations were for the author's time only"; (7) a list of websites; (8) a list of names titled "Characters"; (9) another list of names with numbers next to them—for example, "Ashlie = 9"; (10) a page entitled "Tha [*sic*] Doll Palace," which appears to be a list of job titles and duties—for example, the page states, "My bottom beauty: answers tha [*sic*] phone, keeps postings updated, stays on top of emails . . . , books all appointments, hair, nails, calls, etc. sets up car washes . . . "; (11) a dedication, dated October 18, 2010, to Haley Lucero from Michael Neloms, with a poem on the reverse side of that page; and (14) another list of names.

The novella itself tells the sexually explicit story of a pimp named Dre having sex with various women who work for him. Dre runs an escort service, and Dre splits call money with the women. He has his "girls" drive each other to calls and one brings in another to work for him. Of special importance to the State were two references to "T.T." in the story. They are:

> "10 minutes later I pull up at tha crib, I walk in and see T.T. locked in tha cage 'what you put T.T. in tha cage for?' "that bitch chewed up one of my heels" 'tha ones I just bought you?' "naw an old pair, but still, I liked those heels" 'Aw, I'll get you some more don't trip'
>
> . . . .
>
> ". . . when she leaves I let T.T. out tha cage cuz she knows better than ta chew on anything but her toys when I'm around. she only pull that wit Violet."

Neloms objected to the admission of the documents as irrelevant. At the district court's request, the State provided the court and Neloms with copies of its proposed

exhibit. After ruling that the other papers were admissible, the district court turned to the admissibility of the novella. The judge stated:

> "The whole—the writings and the drawing in the beginning and so forth are of somewhat higher concern because their probative value may be less because they do not appear to be directly related to this case. But I think that I'm going to admit them. I do think they are probative. I think they provide information to the jury that's probative. And while they are prejudicial I think they are more probative than prejudicial and they do concern the head on the issues in this case of human trafficking, trafficking and prostitution, the slang terms used in the trade and so forth. And so based upon that I will go ahead and allow the items that are made and part of the package in Exhibit 101 to be admitted."

Neloms then challenged the foundation for admitting the documents and the State's implied assertion that Neloms had written the novella. The State argued that the novella was relevant and admissible even without asserting Neloms was the author because it had been found with his belongings and it described the sort of behavior underlying the charges. The judge replied:

> "I guess the way I view this is not necessarily in this circumstance that anybody is claiming that Mr. Neloms himself particularly wrote or did not write any of this. I do think there is significant evidentiary value because it is in his house, in a portfolio that clearly has other items that are tied very closely to him, and the writing themselves, the drawings, directly relate to what he's charged with in this case. . . . [I]f someone is suspected of shoplifting and as part of the search of their residence there are drawings of the store or there are articles written by other people published on the internet on how to avoid theft detection devices, obviously those would not have been things written by the suspect, but they would be very probative. Now, they certainly are prejudicial. And if these items were found in Mr. Neloms' possession and he was charged with an armed robbery, then they would still be prejudicial, but they certainly would have very low probative value with regard to the charge of armed robbery. And so overall that's the way I'm viewing this situation is that these items were found along with other items in his

23

residence in a portfolio that had his own social security card amongst other things. And so that's in general the way I'm viewing this and that's why I think they have the significant probative value that they do."

When the State introduced the documents at trial, including the novella, they were designated State's Exhibit 39. Neloms renewed his previous objection, which the district court noted and overruled. Miller testified and identified the novella as papers he had found in the portfolio. The State did not elicit testimony about the content of the novella. On cross-examination, Neloms elicited testimony that the papers found in the portfolio had included a water bill in Starnes' name and a photocopy of Parks' identification card.

Neloms now contends that the novella was irrelevant, so its admission into evidence was reversible error. In response, the State argues that the novella was not so prejudicial as to outweigh its probative value. In the alternative, the State contends that any error in admitting the novella was harmless.

When considering the admissibility of evidence, the first consideration is relevance. *State v. Greene*, 299 Kan. 1087, 1093, 329 P.3d 450 (2014). Relevant evidence is "'evidence that is probative and material.'" Our Supreme Court has defined relevant evidence as evidence "which has 'any tendency in reason to prove any material fact.' [Citation omitted.]" See *State v. Coones*, 301 Kan. 64, 78, 339 P.3d 375 (2014). This court reviews probativity decisions for an abuse of discretion and reviews materiality decisions de novo. *Greene*, 299 Kan. at 1093. The second step is determining if other rules of evidence or legal principles apply. 299 Kan. at 1093. If they do, the third step is applying them and the standard of review depends on the rule being applied. 299 Kan. at 1093. Finally, if there was error in the district court's analysis of the rules of evidence, this court must decide whether the error was harmless. 299 Kan. at 1095.

Neloms asserts, as he did in the district court, that the evidence was irrelevant. He relates the objections and arguments made in the district court, adding nothing new on appeal. He explains that trial counsel objected to admission because the novella was found with documents that did not all belong to Neloms, such as identification cards for M.M. and Starnes; other people had access to the portfolio; there was no evidence that Neloms wrote the story, lists, or poem or drew the picture; the story was dated prior to the crimes alleged in this case; the only reference to T.T. was a dog named T.T.; and the State did not introduce into evidence all of the papers found within the portfolio.

The district court properly addressed all of these arguments below, and Neloms does not offer specific argument or additional legal authority as to how the district court's conclusions were incorrect. Regarding Neloms' complaint that the State did not introduce into evidence every paper found in the portfolio, Neloms could have introduced the remainder of the papers himself, as the district court pointed out to him prior to admitting any of the documents. As the State argues, the rest of Neloms' specific complaints go to the weight of the evidence rather than its admissibility. See *State v. Winston*, 281 Kan. 1114, 1128-29, 135 P.3d 1072 (2006) (explaining that arguments that address the "convincing" nature of evidence go to weight rather than admissibility).

All relevant evidence is admissible unless applicable rules of evidence prohibit admission. See K.S.A. 60-407(f); *State v. Huddleston*, 298 Kan. 941, 959, 318 P.3d 140 (2014). Here, the district court correctly found that the novella was relevant because it tended to show Neloms' knowledge of the world of prostitution and human trafficking, a material issue because Neloms' theory of defense was that he was ignorant of and not involved in M.M.'s prostitution. Thus, Neloms' argument that the district court should have excluded the evidence as irrelevant fails.

The day before sentencing, Neloms filed a pro se motion to dismiss counsel. Neloms asserted that counsel had (1) "purposely ignored [Neloms'] numerous request[s] for important information pertaining to [Neloms'] case"; (2) failed to act with the commitment, dedication, and zeal required by ethical rules; and (3) failed to review "any of the motions that [have] been submitted" or respond to Neloms' attempts to communicate with counsel, leaving Neloms unaware of the status of his case. Neloms claimed there had been a complete breakdown in communication and that he had not received the constitutionally guaranteed effective assistance of counsel.

At the sentencing hearing, defense counsel asked for a continuance and informed the district court that Neloms had just told him that Neloms' family was attempting to retain different counsel for sentencing and appeal; counsel said it was the first he had heard of it. Defense counsel expressed his belief that if Neloms was dissatisfied with his representation and Neloms' family wanted to retain other counsel, the court should allow it. The State opposed the request, pointing out that Neloms had had 9 weeks since the trial to retain a new attorney and had not done so; the State believed Neloms was merely trying to delay the proceedings. The district judge then said, "[Defense counsel], I'll let you or Mr. Neloms set forth anything you would like to with regard to his request at this time." Defense counsel identified the attorney Neloms' family had contacted; Neloms personally made no statement. The district court denied the request for a continuance.

Later in the hearing, the district court judge asked Neloms directly whether he knew any reason the court should not pronounce sentence. Neloms told the judge that he felt that the State had violated his right to a speedy trial, that he was unhappy that his attorney had not raised the speedy trial issue, that he felt all of his motions had been unfairly denied, and that he felt there was insufficient evidence to support his conviction. Immediately before pronouncing sentence, when the district court gave Neloms yet

26

another opportunity to speak, he again raised the sufficiency of the evidence and his speedy trial rights. Neloms stated: "I've been addressing with all my attorneys about all my issues. None of my issues are getting raised, none of my arguments, nothing gets pushed in court. Everything I have gets denied," Neloms otherwise made no reference to dissatisfaction with counsel. The district court then pronounced sentence.

Six days after sentencing, the State filed a response to the pro se motion for new counsel, arguing that it was moot because Neloms' appointed counsel had filed an appeal. On April 29, 2013, the district court filed a motion minutes sheet denying the motion for new counsel, stating: "[Defendant] files request for trial counsel, when case is on appeal and [defendant] has been afforded appellate counsel at this time[.]"

Neloms now argues that the district court violated his Sixth and Fourteenth Amendment rights to conflict-free representation by denying his pro se motion to dismiss counsel. He contends that the district court failed to adequately inquire into the conflict between Neloms and counsel that the motion disclosed. According to Neloms, this failure left him without conflict-free counsel to argue posttrial motions and represent him at sentencing. The State argues that the record does not support the assertion that the district court was aware of Neloms' pro se motion, which was filed the day before sentencing.

> "[B]oth our federal and state constitutions guarantee the right of criminal defendants to have the assistance of counsel. That right to counsel 'requires more than the presence of an attorney; it guarantees the right to *effective* assistance from the attorney.' (Emphasis added.) [Citation omitted.]
>
>   "Yet, our constitutions do not guarantee the defendant the right to choose which attorney will be appointed to represent the defendant. If a defendant seeks substitute counsel, the defendant 'must show "justifiable dissatisfaction" with his or her appointed counsel,' which can be 'demonstrated by showing a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant.' [Citation omitted.] The defendant bears the responsibility of providing '"an articulated statement of attorney dissatisfaction,"' which will, in turn, '"trigger the district

27

court's *duty* to inquire into a potential conflict"' of interest. (Emphasis added.) [Citations omitted.]" *State v. Brown*, 300 Kan. 565, 574-75, 331 P.3d 797 (2014).

This court reviews a district court's actions on a motion to dismiss counsel and appoint new counsel for an abuse of discretion. See *State v. Pfannenstiel*, 302 Kan. ___, 357 P.3d 877, 887-88 (2015). A district court may abuse its discretion in this context in three ways:  (1) becoming aware of a potential conflict of interest between a defendant and his or her attorney but failing to conduct an inquiry; (2) investigating the potential conflict of interest but not fully investigating (a) "the basis for the defendant's dissatisfaction with counsel and ([b]) the facts necessary for determining if that dissatisfaction warrants appointing new counsel"; or (3) conducting an appropriate inquiry but improperly determining whether to substitute counsel. 357 P.3d at 887-88.

Neloms contends that the district court failed to conduct an appropriate inquiry into his complaints or give him an adequate opportunity to argue the motion at sentencing. Contrary to Neloms' assertion on appeal, the record shows that the district court allowed Neloms an opportunity to comment; he simply did not avail himself of that opportunity. Our Supreme Court has held that once a defendant files an articulated statement of dissatisfaction with appointed counsel, the failure to "renew the motion for new counsel periodically" does not relieve the district court of the duty to inquire, see *Brown*, 300 Kan. at 577-78. However, this case is distinguishable because the district court explicitly gave Neloms the opportunity to elaborate on his dissatisfaction with counsel and his desire to retain new counsel. Neloms did not do so.

This case is analogous to *State v. Williams*, 290 Kan. 1050, 1051-52, 236 P.3d 512 (2010). In that case, the defendant sent a letter to her counsel alleging that counsel had negotiated her plea of no contest to felony murder in order to obtain a quick resolution of the case, without regard to the defendant's best interests. At a later hearing on her motion to withdraw her plea, defense counsel entered the letter into the record and informed the

28

district court that the defendant wanted to withdraw her plea because she felt it was not "'done with [her] best interest in mind.'" 290 Kan. at 1051-52. When the district court heard directly from the defendant at the hearing, however, the defendant did not complain about her attorney. Accordingly, when our Supreme Court later considered the defendant's argument on appeal that the district court failed to make the proper inquiries into the alleged conflict between the defendant and her counsel, our Supreme Court held that the district court had not erred. 290 Kan. at 1056.

Similarly, here, when the parties were specifically discussing Neloms' wish to retain different counsel and the district court gave Neloms the chance to air grievances against his counsel, Neloms did not do so. Moreover, as the State points out, it is debatable whether the district court was aware of Neloms' pro se motion. The motion was filed the afternoon before sentencing, at which point it was set on a motions docket before a different judge. According to the notice of the motion hearing, notice was sent through interoffice mail to the assigned motions judge, the district attorney, and defense counsel. There was no mention at the sentencing hearing of the motion by any party. Although defense counsel speculated that the reason Neloms desired to retain new counsel was dissatisfaction with trial counsel, Neloms did not elaborate or articulate at sentencing any specific reason for dissatisfaction.

In short, it appears highly unlikely from the record on appeal that the sentencing court was aware of the pro se motion for new counsel. Moreover, Neloms did not identify any potential conflict of interest to the district court at the sentencing hearing when given the opportunity to do so. Because the district court was never aware of the alleged conflict of interest, it did not trigger the district court's obligation to inquire further. For these reasons, Neloms is not entitled to any relief on this claim.

29

In his final issue on appeal, Neloms contends that the district court imposed an illegal sentence when it ordered him to serve lifetime postrelease supervision in relation to his aggravated trafficking conviction. Neloms points out that at the time he committed the crime, lifetime postrelease supervision was not statutorily mandated for the crime of aggravated human trafficking. The State responds that because lifetime postrelease supervision was appropriate for aggravated indecent liberties with a child, for which Neloms was also convicted, the sentence was not illegal.

An illegal sentence is "'(1) a sentence imposed by a court without jurisdiction; (2) a sentence that does not conform to the applicable statutory provision, either in the character or the term of authorized punishment; or (3) a sentence that is ambiguous with respect to the time and manner in which it is to be served.' [Citation omitted.]" *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 (2015). This court has unlimited review over whether a sentence is illegal. See 301 Kan. at 1034. Although Neloms did not raise this issue below, he may raise it for the first time on appeal. 301 Kan. at 1027.

Neloms is correct:  at the time he committed the crime, aggravated human trafficking was a severity level one person felony, with a postrelease supervision term of 36 months. See K.S.A. 2010 Supp. 21-3447(b); K.S.A. 22-3717(d)(1)(A). Yet the district court sentenced him to lifetime postrelease supervision on the conviction of aggravated human trafficking. Because this sentence did not conform to the applicable statutory provision, it is illegal.

The State acknowledges that the correct postrelease supervision term for aggravated human trafficking was 36 months but points out that aggravated indecent liberties with a child, a severity level 3 crime for which Neloms was also convicted, requires lifetime postrelease supervision. See K.S.A. 22-3717(d)(1)(G), (d)(5); K.S.A.

30

22-3717(d)(1)(G), (d)(2). Furthermore, "[i]n cases where sentences for crimes from more than one severity level have been imposed, the offender shall serve the longest period of postrelease supervision as provided by this section available for any crime upon which sentence was imposed irrespective of the severity level of the crime." K.S.A. 22-3717(d)(1)(F).

The district court erred by sentencing Neloms to lifetime postrelease supervision for his aggravated human trafficking conviction. However, this error does not affect Neloms' overall sentence as he is still subject to lifetime postrelease supervision based on his aggravated indecent liberties with a child conviction. The case is remanded with directions to enter a nunc pro tunc order correcting the postrelease supervision term for Neloms' aggravated human trafficking conviction to 36 months.

Affirmed in part, vacated in part, and remanded with directions.