IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 106,640

STATE OF KANSAS,
*Appellee*,

v.

ANDREW GREENE,
*Appellant*.

SYLLABUS BY THE COURT

1.

K.S.A. 22-3218 requires a criminal defendant to give written notice to the prosecuting attorney if the defendant plans to offer evidence of an alibi at trial. The notice shall state where the defendant contends he or she was at the time of the crime and include the names of alibi witnesses.

2.

When a defendant submits an alibi notice to the State but withdraws or abandons his or her alibi defense before trial, evidence related to the alibi notice or the statements made therein is inadmissible.

3.

When a defendant is convicted of rape and has at least one prior rape conviction, K.S.A. 21-4642 and K.S.A. 21-4704(j)(2)(B) both apply equally and neither is more specific. Such a defendant is therefore to be sentenced under the more lenient statute, K.S.A. 21-4704(j).

1

Appeal from Johnson District Court; JOHN P. BENNETT, judge. Opinion filed July 11, 2014. Conviction affirmed, sentence vacated, and case remanded with directions.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause, and *Ryan Eddinger*, of the same office, was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: A jury convicted Andrew Greene of rape, and the district court imposed a life sentence without the possibility of parole after adjudging Greene an aggravated habitual sex offender. In this direct appeal, Greene argues the district court erroneously admitted statements he made in a pretrial notice of alibi, entitling him to reversal of his conviction and a new trial. We agree the district court erred in admitting Greene's statements, but because we conclude the error was harmless, we affirm Greene's conviction.

Citing *State v. Turner*, 293 Kan. 1085, 272 P.3d 19 (2012), and the rule of lenity, Greene also argues the district court should have sentenced him as a persistent sex offender under K.S.A. 21-4704(j), rather than as an aggravated habitual sex offender under K.S.A. 21-4642. Because we resolved this issue in Greene's favor in *Turner*, we vacate Greene's sentence and remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

The State charged Greene with one count of rape, alleging that on March 9, 2009, Greene had sexual intercourse with A.F. under circumstances when A.F. was incapable of

2

giving consent due to mental deficiency or disease, which condition was known or reasonably apparent to Greene. See K.S.A. 21-3502(a)(1)(C). The following relevant facts were established at Greene's trial.

In 2009, 22-year-old A.F. volunteered at Catholic Charities in Olathe where her mother, M.F., worked as a case manager. M.F. testified A.F. has been diagnosed with autism with pervasive developmental delays and mild to moderate mental retardation and that she has an Intelligence Quotient (IQ) of 55. At Catholic Charities, A.F. performed basic tasks like sorting donated clothing and preparing sacks of groceries for needy families. Greene frequently visited Catholic Charities to pick up bread or clothing.

On March 9, 2009, M.F. left Catholic Charities around 11:15 a.m. to pick up donated appliances. A.F. remained at Catholic Charities, folding clothing and placing it on a hallway table. A.F. testified Greene approached her in the hallway, told her she was pretty, and asked her if she wanted to be his girlfriend. A.F. testified they did not talk long but she liked that Greene paid attention to her, and she was interested in having a boyfriend. Shortly thereafter, A.F. took some empty boxes outside to place them in a dumpster and saw Greene sitting in his car. Greene asked A.F. if she wanted to go for a ride with him, and A.F. got into Greene's car. A.F. testified she wanted to go with Greene, but she did not remember where he said they were going. Over the next few hours, Greene and A.F. visited the public library, visited Greene's friends at a car shop or car wash, stopped at a McDonald's to get a drink, and parked in a wooded area at Lake Olathe.

A.F. testified Greene was nice to her and held her hand as they drove. At some point, Greene asked A.F. to be his girlfriend, and she said yes. While they were parked at the lake, Greene told A.F. to remove her clothing. After A.F. complied, Greene removed his own clothing.

A.F. demonstrated difficulty at trial in identifying and testifying about body parts. But with the aid of a marker, anatomical diagrams of the male and female body, and a series of painstaking questions from the prosecutor, A.F. testified Greene placed his mouth on her mouth, breast, and vagina; placed his penis on the outside of her vagina; and placed his fingers inside her vagina.

After the encounter at the lake, Greene drove A.F. back toward Catholic Charities. Meanwhile, M.F. had returned to Catholic Charities and notified police A.F. was missing. M.F. testified she reported A.F. missing because if A.F. became lost or was in unfamiliar surroundings A.F.'s "mental age [would go] from maybe a 12-, 13-year-old to a 5-year-old," A.F. would be scared, and she would not know how to ask for help.

Henry Harrison, the husband of M.F.'s coworker, assisted with the search. Harrison saw A.F. in a car with Greene near Catholic Charities. Harrison signaled Greene to stop the car, and Greene complied. Harrison rolled down his window and told A.F. the police were looking for her and her mother was very concerned. A.F. got out of Greene's car, and Greene drove away.

A.F. went inside the Catholic Charities building where she was met by M.F. and a police officer. M.F. testified she took hold of A.F.'s hand and could feel A.F. "shaking from the inside." According to M.F., A.F.'s hair was tousled and her face displayed a flat affect, or lack of emotional expression. A.F. did not want to speak with the police, so M.F. took A.F. to M.F.'s office. There, A.F. told M.F. the details of her encounter with Greene as recounted above. M.F. then relayed the information to police.

Later that day, M.F. took A.F. to the hospital for a sexual assault examination. The nurse examiner completed a rape kit and turned it over to police. A.F.'s vaginal and

4

cervical swabs tested negative for seminal fluid, but Greene was identified as a potential male donor of non-sperm DNA found on A.F.'s vaginal swab.

Two days after the incident, M.F. took A.F. to Sunflower House for a forensic interview with Sarah Byall. At trial, Byall testified A.F. seemed shy and primarily communicated through short, "abrupt" answers, but she appeared to understand the questions asked.

A.F. disclosed to Byall that Greene approached her while she was folding clothes and asked her to go to dinner. A.F. agreed and they left in Greene's car, eventually driving to the woods. There, Greene told A.F. to remove her clothes, and he removed his own clothes. A.F. told Byall that she and Greene then engaged in vaginal intercourse and Greene placed his mouth on her breast. After they stopped at Greene's workplace, Greene took A.F. back to Catholic Charities and gave her his phone number.

Byall testified A.F. had difficulty identifying and talking about body parts during the interview so A.F. used diagrams to indicate where Greene touched her. On cross-examination, Byall testified A.F. stated she wanted the sexual encounter to happen. The State admitted the video recording of A.F.'s Sunflower House interview and played it for the jury.

Two inmates who were housed with Greene after his arrest testified on behalf of the State. One inmate, William Haley, testified Greene told him he picked up A.F. from Catholic Charities, talked her into going to a park, convinced her he cared for her, and "fingered her." Haley, who knew M.F. through her work at Catholic Charities, later told M.F. about his conversation with Greene.

5

The second inmate, Fawaz Al-Said, testified Greene told him he was accused of raping a mentally retarded girl. Greene said he saw the girl working inside Catholic Charities, he approached her when she went outside to empty trash, and he asked her where the library was. Greene said the girl agreed to show him where the library was and to get dropped back off, and they went to the library for 2 or 3 hours. Greene also told Al-Said that he took the girl to get a drink at Burger King or McDonald's and to visit some of his friends at an auto detail shop near the Great Mall. Finally, Greene told Al-Said that he took the girl to Lake Olathe and tried to "get head" from her but Greene could not maintain an erection so he spit in his hand, pulled her pants down, and tried to put his fingers inside her vagina. Greene told Al-Said that he also tried to get on top of the girl but could not penetrate her because he could not maintain an erection. As discussed in more detail below, the State also admitted evidence that Greene at one time intended to present an alibi, *i.e.*, to claim he was never with A.F. that day.

Greene did not testify and presented no witnesses. The jury found Greene guilty of rape. At sentencing, the district court found Greene to be an aggravated habitual sex offender as defined in K.S.A. 21-4642 and imposed a life sentence without the possibility of parole. This court's jurisdiction to hear Greene's direct criminal appeal arises under K.S.A. 2013 Supp. 22-3601(b)(3) (life sentence imposed).

DISCUSSION

*The district court erred in admitting statements Greene made in his alibi notice, but that error was harmless.*

Although the district court appointed counsel to represent Greene, Greene vacillated between accepting and declining that representation throughout the proceedings, at times attempting to represent himself or filing pro se motions while

6

represented by counsel. Acting pro se, Greene sent a pretrial notice of alibi to the district attorney's office before trial, stating:

> "'Take notice that the following named witness will be relied upon by the defendant to rebut the testimony and evidence of the State's witness. Miss Tamara Hutchinson will be called upon to give testimony as to where the defendant was at the time in question. Respectfully submitted, Andrew Greene.'"

But Greene did not present an alibi defense at trial. Instead, it appears Greene's theory of defense was that he and A.F. had consensual intercourse. For instance, during opening statements, defense counsel identified the primary issues as (1) whether A.F. could validly consent to intercourse despite her developmental disabilities, and (2) if not, whether Greene knew or reasonably should have known that A.F.'s disabilities rendered her incapable of valid consent.

Near the close of the State's case-in-chief, the prosecutor recalled Detective Kenton Thompson and asked him to describe Greene's defense theories over the course of the proceedings. Over Greene's objections, Thompson testified he listened to several phone calls Greene made from jail and that during those calls, Greene discussed whether he had been with A.F. on the day of the alleged rape. The following colloquy occurred between Thompson and the prosecutor:

> "Q. [Prosecutor] During the pendency of this case, has [Greene] made statements that he wasn't even there?
> "A. [Thompson] Along those lines, yes.
> "Q. And along those lines, can you tell me what you mean?
> "A. He made statements throughout numerous phone calls, you know, initially, that nothing happened with this woman, referring to [A.F.] He made statements, 'I did not have sex with this woman.' He made statements, you know, that no DNA would be found, essentially that nothing happened with her.

7

"Q. Did you interview a woman named Tamara Hutchinson?

"A. Yes, I did.

"Q. How did that name become known to you?"

Defense counsel objected to this last question as irrelevant, but the court overruled the objection, permitting Thompson to testify he learned Hutchinson's name from a letter Greene sent to the district attorney's office. The prosecutor then sought admission of Greene's alibi notice, and defense counsel again objected, stating in a bench conference:

"The defense—the defendant has a right not to present or not to be required or have a burden placed upon them to produce evidence at a trial. Likewise, a defendant has a right not to testify. Admitting [the notice of alibi] is essentially a comment on our failure to present witnesses or to have Mr. Greene testify. That may be fairer rebuttal evidence if we were to present another witness or not present that witness; but by introducing this, it simply points out that we have not presented a witness."

The prosecutor argued the alibi notice demonstrated "the defendant's theory that he wasn't there. It's another statement by him which has changed throughout the course of this case. It's his statement." The court overruled Greene's objection, reasoning:

"I think the statements—the jury could make some inferences from it as to what the defendant was thinking and I think it goes to the issues in the case as to what he believed and what he was saying happened, that sort of thing, just as though he gave his statement to the police. It's that type of evidence, what he told the police or what he told the prosecutor, I think it's admissible."

Thompson then testified Greene's alibi notice indicated Greene was somewhere else at the time of the rape. At the State's request and over Greene's objection, Thompson read the alibi notice into the record. Further, Thompson testified that about the time Greene submitted the alibi notice, Greene suggested in jailhouse phone calls that he had a

witness who would help prove Greene did not do this type of thing. Finally, Thompson testified that in later phone calls, Greene said A.F. consented to the intercourse.

During her closing argument, the prosecutor referred to Greene's jailhouse phone calls and alibi notice, emphasizing that Greene initially denied contact with A.F., later asserted "nothing happened" and no DNA would be found, and ultimately claimed A.F. validly consented to the sexual contact. The prosecutor suggested the jury could infer from Greene's evolving defense theories that Greene knew at the time of the incident that A.F. was incapable of giving valid consent.

*Analysis*

Greene asserts the district court erred in admitting his alibi notice. Specifically, he contends that because he did not deny having intercourse with A.F. and did not present an alibi defense at trial, the statements in the alibi notice were irrelevant and their admission prejudiced him by functionally shifting the burden of proof to him to produce witnesses and evidence in his defense.

In *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010), we set forth the steps an appellate court applies in considering the admissibility of evidence:

> "Under the multistep evidentiary analysis, the first question is relevance. K.S.A. 60-401(b) defines relevant evidence as evidence that is probative and material. On appeal, the question of whether evidence is probative is judged under an abuse of discretion standard; materiality is judged under a de novo standard. [Citation omitted.] The second step is to determine which rules of evidence or other legal principles apply. On appeal, this conclusion is reviewed de novo. [Citation omitted.] In the third step of the analysis, a district court must apply the applicable rule or principle. The appellate court's standard of review of this third step varies depending on the rule or principle that is being

9

applied. Some rules and principles grant the district court discretion, while others raise matters of law."

While the parties briefly mention relevance, they primarily focus their appeal arguments on the second and third steps of the analysis, *i.e.*, whether the district court correctly determined and applied the applicable rule of evidence or legal principle. For purposes of our discussion, we assume the relevancy of the alibi statements and focus on the question of admissibility.

The admissibility of evidence related to a pretrial alibi notice appears to be an issue of first impression in Kansas. K.S.A. 22-3218 requires a criminal defendant give the prosecutor notice in writing if the defendant plans to offer evidence at trial to "the effect that he was at some other place at the time of the crime charged . . . . The notice shall state where defendant contends he was at the time of the crime, and shall have endorsed thereon the names of witnesses he proposes to use in support of such contention." K.S.A. 22-3218; see also *State v. Deffebaugh*, 277 Kan. 720, 722-28, 89 P.3d 582 (2004) (interpreting K.S.A. 22-3218 and discussing the meaning of "alibi").

Here, Greene filed an alibi notice with the prosecutor but did not present an alibi defense at trial. In the federal system as well as several states, evidence related to an alibi notice is inadmissible if the defendant withdraws or abandons that defense before trial. See Fed. R. Crim. Proc. 12.1(f) ("Evidence of an intention to rely on an alibi defense, later withdrawn, or of a statement made in connection with that intention, is not, in any civil or criminal proceeding, admissible against the person who gave notice of the intention."); La. Code Crim. Proc. Ann. art. 727 F (West 2013) (same); see also *Simms v. State*, 194 Md. App. 285, 311, n.18, 4 A.3d 72 (2010) (citing similar rules from other jurisdictions); *State v. O'Neal*, 143 N.M. 437, 441, 176 P.3d 1169 (2008) (discussing "'broader sweep'" of New Mexico Rule 5-508[E], which states: "'The fact that a notice of

10

alibi was given or anything contained in such notice shall not be admissible as evidence in the trial of the case.'").

*Simms* is particularly instructive. There, as here, the defendant did not present an alibi defense at trial but the trial court permitted the State to introduce the defendant's pretrial alibi notice at trial. 194 Md. App. at 289, 298-306. Like Kansas, Maryland had no statutory rule barring the admission of evidence related to an alibi notice. Nevertheless, relying heavily on the rationale of *People v. Shannon*, 88 Mich. App. 138, 276 N.W. 2d 546 (1979), the *Simms* court concluded the trial court erred in admitting the evidence:

> "'Informing the jury of defendant's failure to produce an alibi witness where he had previously given notice unduly denigrates defendant's case when he later chooses to present no evidence. At issue is the jury's ability to draw an impermissible inference of guilt from defendant's decision not to call an alibi witness and its relation to his involvement in the charged crime. A jury is left with the impression that by defendant's unsuccessful attempt to follow through with his alibi, guilt is rendered more presumable and apparent.
>
>    . . . .
>
> "' . . . Where a defendant testifies to an alibi and calls no additional witnesses to support it, the prosecution, by commenting on the nonproduction of corroborating alibi witnesses, is merely pointing out the weakness in defendant's case. When, however, the defendant produces no testimony to support an alibi, the prosecutor, by commenting on the nonproduction of alibi witnesses, is not exposing a weakness in defendant's case, but is rather improperly shifting the burden of proof to the defendant. (Citations and footnotes omitted.)'" *Simms*, 194 Md. App. at 320-21 (quoting *Shannon*, 88 Mich. App. at 143-45).

Like the Maryland Court in *Simms*, we find *Shannon*'s reasoning persuasive, and we agree with Greene that the admission of his alibi notice essentially "functioned as burden shifting or commentary on [his] failure to produce witnesses or evidence in his defense." We hold that when a defendant submits an alibi notice to the State but

11

withdraws or abandons his or her alibi defense before trial, evidence related to the alibi notice or the statements made therein are inadmissible. Because Greene did not present an alibi defense at trial, the district court erred in admitting evidence related to Greene's alibi notice.

Nevertheless, the erroneous admission of evidence is subject to review for harmless error. See K.S.A. 60-261. The harmless-error analysis under K.S.A. 60-261 ordinarily requires us to determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013). But we apply a more stringent harmless-error standard when an error infringes on federal constitutional rights. Under that standard, an error may be declared harmless if there is no reasonable possibility the error affected the outcome. *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Under either standard, the party benefitting from the error bears the burden of establishing the error was harmless. *Longstaff*, 296 Kan. at 895; *Ward*, 292 Kan. at 568-69.

Under the facts of this case, we conclude the error was harmless under either standard. At trial, it was undisputed that Greene had sexual intercourse with A.F., and A.F.'s own testimony tended to support Greene's claim that the intercourse was consensual. Thus, the primary issues for Greene's jury were whether A.F.'s mental disease or deficiency rendered her incapable of giving valid consent and, if so, whether the condition that rendered A.F. incapable of giving valid consent was known or reasonably apparent to Greene.

The uncontroverted evidence at trial established that A.F. has autism with pervasive developmental delays, mild to moderate mental retardation, and a below-average IQ. A.F.'s psychiatrist, Ulisa Diane Buckingham, testified that at the time of the

incident A.F. could read at a sixth-grade level, functioned at a 14- or 15-year-old level, and could not live independently. According to Buckingham, A.F. required adult supervision for basic activities such as bathing, brushing teeth, and cooking.

Further, Buckingham testified A.F. demonstrated a delayed understanding of sexual intercourse and its attendant consequences. Buckingham described a conversation with A.F. approximately 2 months before the rape, in which A.F. told Buckingham she had seen a photograph of two fully-clothed girls kissing and asked Buckingham what it means to have oral sex with a boy. Buckingham opined that A.F.'s inquiry was indicative of a "teenage exploration phase" and explained that A.F. had no concept of the meaning of oral sex or its associated risks.

Buckingham further testified A.F. had never asked about sexual intercourse and that at the time of the rape, A.F. would not have understood any of the underlying issues related to sexual intercourse. In a session with Buckingham 1 month after the rape, A.F. told Buckingham she wanted to get pregnant. According to Buckingham, A.F. demonstrated no understanding of what caused pregnancy or of how she would care for a child. Buckingham equated A.F.'s statement to a child-like fantasy.

A.F.'s trial testimony corroborated Buckingham's testimony describing A.F.'s limited sexual knowledge. A.F. testified for nearly 2 hours, and at one point, the prosecutor asked her several questions about her understanding of sex. The following colloquy occurred:

"Q. [Prosecutor] Back in March before this happened to you, did you know what sex was?
"A. [A.F.] Yes.
"Q. What is sex?
"A. I don't know.

13

"Q. Don't know or can't say?

"A. Don't want to say.

"Q. We talked earlier about sex at a previous hearing. Is sex something that happens with a boyfriend and girlfriend?

"A. Yes.

"Q. Can you tell me what sex is?

"A. No.

"Q. Can you [*sic*] me what the purpose of sex is? Do you know why people have sex?

"A. Yes.

"Q. Why do people have sex?

"A. I don't know.

"Q. Don't know or don't want to say?

"A. Don't want to say.

"Q. Have you learned more about sex since this case started?

"A. Yes.

"Q. What have you learned about sex since this case started?

"A. (No response.)

"Q. Now you said earlier that you use your vagina to pee; is that correct?

"A. Yes."

On cross-examination, A.F. testified that after Greene parked at the lake he talked about wanting to have sex with her. A.F. testified she was interested in having sex with Greene, but when defense counsel asked her if she could have said no, A.F. stated, "Probably not." Defense counsel then asked why she thought she couldn't say no, and A.F. responded, "I don't know." A.F. also testified she enjoyed the encounter with Greene. On redirect, the prosecutor asked A.F. if she understood the term "consent." A.F. testified consent "[m]eans you're giving them permission" and further testified she gave permission for someone to touch her body that day.

14

Despite A.F.'s testimony that she consented to the sexual encounter with Greene, the jury nevertheless was required to decide whether A.F. was capable of giving valid consent in light of her developmental disabilities. See *State v. Ice*, 27 Kan. App. 2d 1, 4-5, 997 P.2d 737 (2000) ("If an individual can comprehend the sexual nature of the proposed act, can understand he or she has the right to refuse to participate, and possesses a rudimentary grasp of the possible results arising from participation in the act, he or she has the capacity to consent.").

Buckingham's testimony regarding A.F.'s limited understanding of sexual intercourse as well as A.F.'s own testimony clearly demonstrated A.F.'s inability to comprehend the sexual nature of the act, its potential results, or her right to refuse to participate. Further, it is significant that A.F. testified for almost 2 hours, permitting the jury to fully assess A.F.'s responses and demeanor and determine based on all the evidence whether A.F. comprehended the sexual nature of the acts she engaged in with Greene, understood she had a right to refuse, and possessed a rudimentary grasp of the consequences. Additionally, we find it compelling that although A.F. testified nearly 2 years after the incident, her testimony substantially corresponded with her prior statements to M.F. and the forensic interviewer. Finally, A.F.'s trial testimony substantially corresponded with the inculpatory statements Greene made to two inmates while awaiting trial.

Based on our review of the record, we are firmly convinced there is no reasonable possibility that the erroneous admission of Greene's statements in his alibi notice contributed to the verdict, and we affirm his conviction.

15

*The district court should have sentenced Greene as a persistent sex offender under K.S.A. 21-4704(j).*

Next, relying on *State v. Turner*, 293 Kan. 1085, 272 P.3d 19 (2012), Greene argues the district court erred in sentencing him as an aggravated habitual sex offender under K.S.A. 21-4642, rather than sentencing him as a persistent sex offender under K.S.A. 21-4704(j).

In *Turner*, we held, "[w]hen a defendant is convicted of rape and has at least one prior rape conviction, K.S.A. 21-4642 and K.S.A. 21-4704(j)(2)(B) both apply equally and neither is more specific. Such a defendant is therefore to be sentenced under the more lenient statute, K.S.A. 21-4704(j)." 293 Kan. 1085, Syl. ¶ 4.

Greene was convicted of rape, and he has at least one prior rape conviction from 1975. This subjects him to sentencing as a persistent sex offender under K.S.A. 21-4704(j)(2)(B). Additionally, Greene has two prior conviction events for sexually violent crimes: (1) two 1975 Kansas convictions entered on the same day in the same court for rape and aggravated indecent liberties, and (2) a 1984 Missouri conviction for first-degree sexual abuse. This subjects him to sentencing as an aggravated habitual sex offender under K.S.A. 21-4642. Because both statutes apply equally and neither is more specific, our ruling in *Turner* requires that Greene be sentenced under the more lenient statute. Consequently, we vacate his sentence and remand for resentencing under K.S.A. 21-4704(j).

Conviction affirmed, sentence vacated, and case remanded for resentencing.

BILES, J., concurs in the result.