IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,554

STATE OF KANSAS,
*Appellee*,

v.

DANIEL PEREZ,
*Appellant.*

SYLLABUS BY THE COURT

1.

When considering the legal basis for a district judge's admission of evidence, the review is de novo.

2.

Hearsay is evidence of a statement which is made other than by a witness while testifying at a hearing, offered to prove the truth of the matter stated and is generally inadmissible.

3.

For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error

1

was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221 (2012).

4.

When admitting prior crime evidence under K.S.A. 2015 Supp. 60-455, the district court first determines whether the fact to be proven by the evidence is material, then considers whether the evidence is relevant to a disputed fact, and, finally, decides whether the probative value of the evidence outweighs the potential for undue prejudice.

5.

An appellate court reviews a district court's decision that the probative value of evidence outweighed the potential for undue prejudice for an abuse of discretion.

6.

A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based.

7.

Prior crime evidence that is material and relevant to a disputed fact is admissible only if its probative value outweighs the potential for undue prejudice.

8.

The risk of undue prejudice turns not on whether the evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial.

9.

When prior misconduct involves the same victims and the conduct at issue was of the same character as that underlying the charged crimes, the misconduct is unlikely to contribute to an improper jury verdict, as long as the jury is properly instructed.

10.

When an instructional error is raised for the first time on appeal, this court reviews whether the instruction was clearly erroneous. To establish a clearly erroneous instruction error, the defendant must firmly convince the court the jury would have reached a different result without the error.

11.

Because prior crime evidence is generally not admissible to show the defendant's propensity to commit the charged crime, when it is admitted, the trial judge must provide a limiting instruction to ensure that the jury does not consider it as propensity evidence.

12.

Under K.S.A. 2015 Supp. 60-455(d), evidence of prior sexual misconduct is admissible to be considered for any matter to which it is relevant and probative, including propensity, when the defendant is charged with a sex crime. Because the evidence is admissible for any purpose, no limiting instruction is required regarding prior sexual misconduct when the defendant is charged with a sex crime.

Appeal from Sedgwick District Court; JOSEPH BRIBIESCA, judge. Opinion filed June 23, 2017. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lesley A. Isherwood*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Daniel Perez takes this direct appeal from his convictions for first-degree premeditated murder; sexual exploitation of a child; eight counts of rape; seven counts of aggravated criminal sodomy; three counts of aggravated assault; and eight counts of making false information. On appeal, Perez raises four arguments for why his convictions cannot stand: (1) the district court erred by admitting inadmissible hearsay testimony; (2) the district court erred by failing to instruct the jury on assisting suicide as a lesser included offense of first-degree premeditated murder; (3) the district court erred by admitting prior crime evidence that was more prejudicial than it was probative; (4) the district court provided clearly erroneous limiting instructions in regard to the prior crime evidence; and (5) the cumulative effect of these errors deprived him of a fair trial. Finding no reversible error on the part of the trial court, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In our discussion of the facts, we will refer to the witnesses and victims by first name because many of them share surnames or changed surnames after marriage. Sometime before the mid-1990s, Perez was living in Texas. There, he met a woman named Patricia Gomez (Trish) and the two began a sexual relationship. Trish later married and took the surname Hughes.

Later, but sometime before April 1996, Perez met another woman named Marilynn. Perez let Marilynn, her son, and her 14-year old daughter, Michelle, stay with him for a few weeks while Marilynn readied her family to move to Amarillo. Michelle testified that during that time and again after she had moved away from Perez, Perez

4

forced her to have sex with him on several different occasions. Marilynn testified that Texas filed charges against Perez for the alleged rape but that the case was dismissed because Perez had been found dead in Mexico. Perez testified that he had in fact pled guilty to these charges in exchange for probation but on his way to sentencing he was abducted by four uniformed men who beat him and left him for dead in either Texas or Mexico. Detective Ron Goodwyn, the lead detective on Perez' case, confirmed at trial that Perez had been convicted on these charges but testified that the convictions had been dismissed because Perez was believed to be dead.

Perez testified that Trish found him where the uniformed men had left him for dead and took him to people who cared for his injuries. Perez testified that he went to Corpus Christi, Texas, after he healed from his injuries.

Around the summer of 1996, Perez was in North Dakota. There, he met 15-year-old K.L. Perez was about 46 years old at the time but led K.L. to believe he was much younger. The two developed a romantic and sexual relationship. Perez convinced K.L. that he had powers that allowed him to make it rain; to see someone's past, present, and future; and to receive information from "the other side."

K.L. and Perez testified that after 3 months of their relationship, law enforcement authorities picked Perez up at K.L.'s house, took him away in handcuffs, and deported him to Mexico. It is not clear this is actually what happened because Perez testified that he is a United States citizen. Nonetheless, Perez did not return to North Dakota after he was apprehended at K.L.'s house. K.L. stayed in contact with Perez over the next year by phone but was not sure where he was.

Sometime in 1996 or 1997, Perez was living in an apartment complex in Corpus Christi, Texas, and going by the name "Lou Castro." During this time, Perez met a woman named Mona Griffith who was living in the same complex with her daughter,

Lindsey, and her son, Cody. Eventually, Mona, her family, Perez, and Trish moved into an apartment in a different complex. After a few months, Mona, Lindsey, Perez, and Trish all moved to Wichita, Kansas. Cody stayed behind with his father.

After the group relocated to Wichita, K.L. reunited with Perez. K.L. quickly became jealous of Perez' affectionate relationship with Lindsey, who was then 14 years old. After 2 weeks in Wichita, K.L. returned to North Dakota to finish school. While K.L. was away, the group moved to South Dakota. In South Dakota, Trish met Brian Hughes and the two began dating. At some point, Mona became engaged to a man named Jim.

While in South Dakota, Perez, Trish, and Mona went to an insurance office where Mona purchased a policy on her life in the amount of $750,000 and named Lindsey as the beneficiary and Trish as Lindsey's caregiver.

After the life insurance policy was purchased, a plane that Mona, Jim, and Lindsey had been on went missing. Perez and Trish tried to procure the death benefit from Mona's life insurance policy, but, because Mona's body had not been recovered, the insurance agency would not pay the benefit. Perez and Trish visited the insurance agency multiple times while the search for the plane was underway. Eventually, when the remnants of the plane were recovered and death certificates were issued for Mona, Lindsey, and Jim, the insurance agency paid Trish the death benefit.

Around the summer of 2001, Trish, Brian, their new baby, Nicole; Perez; and K.L. moved to Lee's Summit, Missouri. A real estate agent named Jennifer Hutson helped the group find a house, which the group purchased in K.L.'s name. After 3 months, the group sold the house and moved back to Wichita, where they settled in some townhomes while they awaited more permanent arrangements. Jennifer, who had become friends with Perez, moved with the group to Wichita. She took her two daughters with her—E.H., age 10, and S.H., age 17. Over time, the group built three houses for themselves next door to

6

each other in Sedgwick County, Kansas. The group was living in these homes by spring 2002 and referred to them collectively as "Angel's Landing."

Much of the conduct for which Perez was convicted occurred while the group was living at Angel's Landing. We describe this conduct here.

*Rape, aggravated criminal sodomy, and aggravated assault of E.H. and S.H.; aggravated assault of K.L.; and sexual exploitation of C.C.*

Perez began sexually abusing E.H. and S.H. almost as soon as they joined the group in 2001. The girls testified that between 2001 and when Perez went to jail in the spring of 2010, Perez forced them to have sex with him "hundreds of times." Both girls testified that they believed Perez was "special" and had certain powers. Perez had told them that he was hundreds of years old and was often inhabited by one of three different angels—Arthur, Daniel, and the angel of death named Amber—and that the angels needed sex from young girls to survive. The State focused on a few specific instances of this forced sex, described here.

When the group moved to Angel's Landing, E.H. moved into the master bedroom with Perez. She was 10 years old at the time. Perez told E.H. that she needed to share his bed because he was a "seer" who needed a "pure" person—meaning a young, female virgin—to take care of him, or he would die. A few weeks after E.H. began staying with Perez, in January of 2002, Perez began forcing E.H. to have oral, vaginal, and anal sex with him.

Another instance occurred in 2007. Early one morning, around 2 a.m., S.H. awoke E.H. and told her to get dressed and go outside to the shop because Perez was angry. K.L. and Perez were in the shop when the girls arrived. Perez grabbed E.H. and S.H. by the throats and told them he could kill them if he wanted to. Perez ordered the three girls to

7

undress and began waiving a gun around. Perez used the gun to shoot at a computer tower in the shop. After he fired the shots, Perez ordered the girls to go to the master bedroom of one of the houses. In the bedroom, Perez ordered E.H. and S.H. to the bed and K.L. to the corner. Perez then inserted his beer bottle into S.H.'s and E.H.'s vaginas and then made K.L. drink from the bottle. Perez then made K.L. leave the room so he could "feed." Perez then forced S.H. and E.H. to perform oral sex on each other and on him and to engage in vaginal and anal sex with him.

A different time in 2007, Perez called another meeting with S.H., E.H., and K.L. During this meeting, Perez told the girls that Jennifer was going to die and so K.L. needed to step up. Perez told K.L. that if she did not step up, she would be the one to die. After this discussion, Perez forced E.H. and S.H. to have oral, vaginal, and anal sex with him.

E.H. also testified regarding a time when Perez became violent and raped her after E.H. tried to prevent the rape. S.H. testified about a time when Perez forced her to have oral and vaginal sex with him under a threat that he would kill her father if she did not comply.

Sometime after August 2006, a woman named Sherri Cox began visiting Angel's Landing with her daughter, C.C. On one of these occasions, when C.C. was approximately 8 years old, Perez directed C.C. to sit provocatively in her swimsuit while he took photos of her. Perez also directed S.H. to plant a video camera in the bathroom to secretly record C.C. while she changed from her clothes to a swimsuit.

*Making false information*

Perez was also convicted of making false information in connection with applications for life insurance and car loans. When the group moved to Wichita, Trish

took out a $1 million insurance policy on her life that included an accidental death rider. She named Brian, by then her husband, as the beneficiary, and K.L. as the co-beneficiary. Brian, K.L., Jennifer, and a woman who joined the group in 2004, Megan Harbert, also took out insurance policies on their own lives. Perez was present each time one of the members took out a policy and directed who would take out the policy, what the amount would be, and who would be the beneficiaries. The State presented evidence that both K.L. and Megan reported inflated net worths on the applications for their life insurance policies.

The group also purchased a large number of vehicles on credit while living in Wichita. While Perez generally directed the application process, the paperwork was completed in the names of the other various group members, never Perez. Various witnesses testified that the loan applications for these cars were falsified.

*Murder of Patricia Hughes*

Perez was charged and convicted for the murder of Trish. In June 2003, Perez and Trish told E.H. that it was Trish's "time to go." They explained that Trish should have "crossed over" during an earlier accident but that it had not worked. Perez told E.H. that there would be an accident by the pool where Trish would slip and hit her head and die. Perez asked E.H. if she wanted to be there when it happened. Because E.H. did not want to be there, Perez told her that he would "bend time" for her so that she could be at the pool and somewhere else at the same time. Perez explained that on that day, after Trish passed, E.H. would put Nicole in the pool and then bring her out and call 911 to alert emergency services that Nicole had fallen into the pool and Trish had slipped and drowned trying to get Nicole out. When E.H. expressed feeling sad about Trish's upcoming death, Perez and Trish explained that Trish would eventually come back in a newer, healthier body.

9

Two weeks later, when only E.H., Perez, Trish, and Nicole were at Angel's Landing, Perez told E.H. that "it was time." The four went out to the pool, and Perez began to uncoil the pool hose. Perez told E.H. to take Nicole into the closet of the neighboring pool house and not come out. E.H. did as told and soon heard a shriek from Trish and then a splash. A short time later, Perez came inside out of breath and with wet forearms. Perez told E.H. to wait long enough for him to get to a local car dealership and then move forward with the plan. E.H. did as told; after 20 minutes, she went to the pool where she saw Trish's body floating in the shallow end, got into the pool with Nicole, and then called 911 with her story.

When the paramedics arrived, they were surprised to find Trish floating in the shallow end of the pool, instead of submerged in the deep end. Trish was eventually pronounced dead, and an autopsy, combined with the witness reports provided regarding the circumstances of her death, determined the cause and manner of death was accidental drowning. The coroner also found some blunt force injury on Trish's head.

Perez testified that he was not at the pool when Trish died, but at a car dealership. Two defense witnesses testified that Perez was not at the house when the paramedics arrived. In August of 2003, Trish's death benefit was paid to Brian.

The group continued to live at Angel's Landing after Trish's death. Jennifer began dating a man named David Quiring in 2003. In 2004, David moved in with Jennifer at Angel's Landing and the two eventually married. Also in 2004, Perez began dating Megan. Megan quickly moved into Perez' house at Angel's Landing. They eventually had a child together, named Angelica, in December 2004.

In March of 2006, Brian made a visit to South Dakota. After Brian left, Perez told a friend, Phillip Young, that he did not think Brian would return. Perez was correct—

Brian was killed in an accident in South Dakota. After Brian's death, his life insurance benefit was paid to K.L.

In September 2008, Jennifer died after driving head-on into traffic. K.L. received a death benefit payout after Jennifer's accident.

In March of 2009, Perez moved to Tennessee with some of the people still living at Angel's Landing: Megan, Angelica, and a new member named Blake. K.L. stayed behind initially with E.H. and Nicole so the two girls could finish school, but the three followed Perez to Tennessee in June of 2009.

S.H. did not accompany the group to Tennessee because, by that time, she had moved out of Angel's Landing and was dating a man named Daniel McGrath. Eventually, S.H. described her past to Daniel. S.H. revealed details about the group members' deaths, said that they were all expected to serve Perez, and said that the income that supported the group was made up of life insurance proceeds. Daniel eventually reported all of the information he had learned to the FBI. In January of 2010, Goodwyn along with Jon Sullivan of the FBI interviewed Daniel about the things he had reported.

Goodwyn had been investigating Perez and his group members since 2003. Sullivan had been investigating Perez since 2007. The two detectives continued to investigate Perez and eventually learned that Perez had assumed a new identity—Joe Venegas—in Columbia, Tennessee. On April 21, 2010, a search warrant was executed at Perez' Tennessee residence. Officers uncovered 11 firearms, 2 wallets with identification for Lou Castro and Joe Venegas, and a Social Security card and birth certificate for Joe Venegas. Perez was arrested and taken into custody on the same day.

Detectives interviewed S.H., K.L., and E.H. a number of times between April 2010 and March 2011. Based on the investigations and police interviews, Perez was

11

charged in Sedgwick County District Court on September 11, 2011, with first-degree murder for the death of Patricia Hughes, 10 counts of rape, 10 counts of aggravated criminal sodomy, 3 counts of aggravated assault, 11 counts of making false information, and 1 count of criminal threat. The complaint was later amended and proceeded to trial on 1 count of first-degree premeditated murder; 1 count of sexual exploitation of a child; 8 counts of rape; 7 counts of aggravated criminal sodomy; 3 counts of aggravated assault; and 8 counts of making false information.

A number of witnesses affiliated with the group testified for the State, including Daniel, K.L., E.H., Cody, a friend of Perez named Phillip, Michelle, Marilynn, David, Megan, S.H., C.C., and C.C.'s mother. The insurance agents and car salespersons who sold the group their policies and vehicles also testified for the State. Perez testified in his own defense, along with three other witnesses. The jury convicted Perez as charged. The court sentenced Perez to two life terms, with a consecutive sentence of 406 months.

DISCUSSION

*Goodwyn's testimony regarding out-of-court statements*

During trial, Goodwyn testified regarding the reasons he had been investigating Perez. Some of this testimony described out-of-court statements. The trial court admitted this testimony over Perez' hearsay objections after concluding that the out-of-court statements were only offered to explain why the detective pursued Perez, not for their truth. On appeal, Perez claims that these statements were offered for their truth, and, consequently, the trial court erred in admitting this testimony.

Perez argues that the trial judge made a legal error in concluding that these statements were not hearsay. When considering the legal basis for a district judge's admission of evidence, the review is de novo. See *State v. Cosby*, 293 Kan. 121, 126-27,

12

262 P.3d 285 (2011) (reviewing de novo party's claim that statement was admissible because it was not hearsay).

Hearsay evidence is generally inadmissible. K.S.A. 2015 Supp. 60-460. The relevant Kansas statute defines hearsay as "[e]vidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated. . . ." K.S.A. 2015 Supp. 60-460.

But a law enforcement officer may testify regarding the reasons an officer "'approached a suspect or went to the scene of the crime'" because this evidence is not offered to prove the truth of the matter stated but rather to explain why an officer took certain actions. *State v. Thompson*, 221 Kan. 176, 178, 558 P.2d 93 (1976); see also *United States v. Freeman*, 816 F.2d 558, 563 (10th Cir. 1987) (out-of-court statement not hearsay if it is offered for the limited purpose of explaining why government investigation was undertaken). However, this legal premise has its limits. Where "'the information as related to the jury directly or by necessary inference points to the guilt of the defendant, the testimony is inadmissible.'" 221 Kan. at 178-79.

During the trial of the present case, the State questioned whether Goodwyn had "received information" that "drew [his] attention to the matter that is ultimately before this jury." Goodwyn indicated that he had. The State then questioned Perez at length regarding the information that had prompted his investigation into Perez.

Perez argues that the information was offered to prove the truth of the matter stated because it was offered "to establish the connection between Mr. Perez and several 'accidental' deaths" "in order to establish intent and motive for the charged crime," "to supplement the State's case by showing a pattern of behavior," and to "support[] the State's theory that Perez had a history of staging deaths."

13

Specifically, Perez takes issue with the following testimony:

- Goodwyn's testimony that he found an obituary on the internet that named Castro as the brother of Mona, who died in a plane crash in South Dakota in 2001.

- Goodwyn's testimony regarding information he learned from "reports" from South Dakota and talks with Brian's family in South Dakota. This testimony revealed that Brian died when a jack fell on him while he was working on his brother and sister-in-law's car, that Brian was a diesel truck mechanic, and that Brian had been arrested for a DUI a few weeks prior to his death but was not in police custody for very long.

- Goodwyn's testimony that, based upon his review of financial and insurance records, certain accounts were replenished after each of the group members' deaths.

- Goodwyn's testimony that he learned Castro had a hobby of flying pricey remote control planes.

- Goodwyn's testimony that he had obtained from a Texas employer documents indicating Perez had a work history as an airplane mechanic.

- Goodwyn's testimony that a Texas warrant was dismissed in 2002 because Perez was dead.

- Goodwyn's testimony that other sheriff's officers believed Perez to be dead because there was information indicating Perez' wallet was found on a dead body in Mexico.

14

Even if we assume that the admission of this testimony was error, we conclude that it was harmless. See *State v. Greene*, 299 Kan. 1087, 1095, 329 P.3d 450 (2014) (erroneous admission of evidence is subject to review for harmless error). The harmless error analysis under K.S.A. 2015 Supp. 60-261 requires us to determine whether there is a reasonable probability that the error affected the outcome of the trial in light of the entire record. *State v. Longstaff*, 296 Kan. 884, 895, 299 P.3d 268 (2013).

Nearly all of the information about which Goodwyn testified was cumulative of evidence that was admitted by other means. K.L. testified that Mona died in a plane crash, and a friend of Perez testified that Perez had received some proceeds from his "sister's" plane crash. Three separate witnesses testified about the circumstances surrounding Brian's death: K.L., one of Perez' friends, and Perez himself. Perez specifically indicated that Brian died after a car fell on him. Patricia's mother and S.H. testified that Brian had been a car mechanic. Two insurance agents testified to insurance payments after each of the deaths. More than one witness revealed that Perez kept remote control airplanes. Perez testified that he had been a jet mechanic in the Navy. A State's witness and a defense witness testified that an early Texas case against Perez was not pursued because Perez was thought to be dead.

While a few pieces of this testimony appear to have come into evidence only via Goodwyn's testimony—specifically, the testimony that the car Brian had been working on when he died belonged to his brother and sister-in-law, that the slip of a car jack is what caused the car to fall on Brian, that Brian was cited for driving under the influence in the days before his death, and that Perez' wallet had been found on a dead body in Mexico—none of this testimony directly or by necessary inference implicated Perez in the charged crimes. Thus, the admission of this testimony could not have reasonably affected the outcome of the trial in light of the entire record.

15

In sum, we conclude that Goodwyn's testimony was largely cumulative of otherwise admissible evidence and therefore any error in its admission was harmless.

*Assisting Suicide Instruction*

Perez argues that the trial court erred when it denied his request to instruct the jury on assisting suicide as a lesser included offense of first-degree premeditated murder.

The standard of review for jury instruction issues is well-established:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward,* 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221.'" *State v. Williams*, 303 Kan. 585, 598-99, 363 P.3d 1101 (2016).

The State concedes that Perez requested an assisting suicide instruction in his proposed instructions and renewed his request for the same during conference. Thus, step one of this review is satisfied and we move on in our inquiry.

Under step two, we consider whether an assisting suicide instruction was legally appropriate in this case. For such an instruction to be legally appropriate, assisting suicide must be a lesser included offense of first-degree premeditated murder. In previous cases where we have confronted this issue, we found no cause to render a conclusion because such an instruction would not have been factually appropriate under step three of our review. See *State v. Cobb*, 229 Kan. 522, 625 P.2d 1133 (1981); *State v. Baker*, 281 Kan.

16

997, 135 P.3d 1098 (2006). The same circumstances apply to this case. We do not decide whether assisting suicide is a lesser included offense of first-degree premeditated murder because the facts do not support such an instruction.

In deciding whether the facts support the requested instruction, we consider whether "there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction." *Williams*, 303 Kan. at 598-99. If the facts of this case would not allow a jury to find that Perez committed the crime of assisting suicide, there is not sufficient evidence to support such an instruction.

K.S.A. 2016 Supp. 21-5407 provides that assisting suicide is:

"(1) Knowingly, by force or duress, causing another person to commit or attempt to commit suicide; or

"(2) intentionally assisting another person to commit or to attempt to commit suicide by:

(A) Providing the physical means by which another person commits or attempts to commit suicide; or

(B) participating in a physical act by which another person commits or attempts to commit suicide."

In *Cobb*, we considered a previous version of the assisting suicide statute and ultimately concluded that the facts did not support an assisting suicide instruction because the victim "did not destroy himself." 229 Kan. at 526. While the victim had asked the defendant to kill him and had placed a syringe loaded with cocaine in his own arm, "the actual destruction was performed by [the defendant]" when she pushed the plunger of the syringe and pulled the trigger on the pistol. 229 Kan. at 523, 526.

17

Perez attempts to distinguish this case from *Cobb* because the current assisting suicide statute is slightly different than it was in *Cobb*. Perez points out that the statute in *Cobb* defined assisting suicide as "'intentionally advising, encouraging or assisting another in the taking of his own life'" but today's statute is "specifically broader, encompassing 'providing the physical means' and 'participating in a physical act' by which another person commits suicide."

We are not persuaded by Perez' argument because the current assisting suicide statute still requires that "another person . . . commit or attempt to commit suicide," as did the statute in *Cobb*. K.S.A. 2016 Supp. 21-5407; 229 Kan. at 525 (quoting the assisting suicide statute as requiring that the defendant encourage or assist "another in the taking of his own life"). The statute therefore still requires that the deceased take his or her own life, and Perez has failed to show how the changes in the statute make any difference under these facts.

Regardless of *Cobb*'s applicability, Perez argues that the State presented evidence that justified an assisting suicide instruction under the current statute. In support, Perez points to evidence of the following: that Trish wanted to die; that Trish and Perez foretold Trish's death; that Perez was at the pool uncoiling the pool hose moments before Trish's death; that Perez told E.H. to go inside immediately before E.H. heard a scream and a splash in the pool; that Perez came inside shortly thereafter, panting and with wet arms; that Trish was found face down in the shallow end of the pool by the stairs; that Trish had no defensive injuries on her hands or legs; that there were blunt force wounds on her head but no injuries to the brain; and that the testifying pathologist had seen another case of suicidal drowning when the deceased put weights on his or her legs and jumped into the pool.

The State responds that none of this evidence suggests that Trish took her own life, which would be a requirement under the assisting suicide instruction. In contrast, the State argues that the evidence shows Perez held Trish underwater until she drowned. The State cites much of the same evidence as does Perez to support its argument. It also points to evidence of the following: that 2 weeks before Trish's death, Perez told E.H. that Trish was going to hit her head on the pool; that after Trish drowned, Perez told E.H. to wait long enough for him to get to a car dealership before calling the police to report that Trish slipped and fell while trying to rescue Nicole; that a medical expert concluded there was no way Trish's death was accidental, Trish had bruises on the back of her head that were indicative of grip marks from behind, and the story that Trish had fallen into the pool was not consistent with Trish's minor injuries; and that Trish had a broken barrette in her hair, suggesting someone had gripped her head.

The State further points out that any desire to die on Trish's part does nothing to negate an act of homicide because "consent does not transform an active killing of another into a suicide." Finally, the State argues that Perez' own testimony undermines a conclusion that this instruction was appropriate because he testified that he was not even present at the residence when the drowning occurred.

We agree with the State. While there is evidence that Trish wanted to die, and she may have even walked or fallen into the pool on purpose, additional evidence suggests that Perez actually held Trish's head underwater until she drowned. Like the circumstances in *Cobb*, such a scenario means that the deceased did not perform the actual destruction, thus failing to satisfy one of the elements of the assisting suicide statute. While the evidence suggests that Trish was aware she would die and perhaps wanted this result, none of the evidence, even viewed in a light favorable to the defendant, suggests that Trish actually drowned herself. It instead suggests that Perez held her underwater until she died.

19

In sum, we conclude that the evidence before the jury was insufficient to support an instruction of assisting suicide and therefore its omission was not error.

*K.S.A. 2015 Supp. 60-455 Prior Crime Evidence*

Perez argues that the district court erred in admitting prior crime evidence under K.S.A. 2015 Supp. 60-455 regarding the deaths and insurance payouts of other group members, prior sex acts, and fraud. Perez claims that this evidence was inadmissible because it was highly prejudicial.

When admitting prior crime evidence under K.S.A. 2015 Supp. 60-455, the district court first determines whether the fact to be proven by the evidence is material, then considers whether the evidence is relevant to a disputed fact, and, finally, decides whether the probative value of the evidence outweighs the potential for undue prejudice. *State v. Richard*, 300 Kan. 715, 721, 333 P.3d 179 (2014). Here, Perez takes issue only with the judge's conclusion that the probative value of the evidence outweighed the potential for undue prejudice. An appellate court reviews this decision for an abuse of discretion. *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). "A district court abuses its discretion when: (1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based." *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014).

The risk of undue prejudice "turns not on whether the evidence is damaging but on whether the evidence is likely to contribute to an improper jury verdict or distract from the central issues at trial." 303 Kan. at 395. When prior misconduct "involve[s] the same victims[] and the conduct at issue was of the same character as that underlying the

20

charged crimes," the misconduct is "unlikely to contribute to an improper jury verdict," as long as the jury is properly instructed. 303 Kan. at 395.

We have previously concluded that a district court acted within its discretion in deciding prior crime evidence was more probative than prejudicial when the evidence was highly probative of identity and plan, the district court instructed the jury to consider the evidence only for those purposes, and there was no evidence that the jury failed to abide by the instruction. *State v. Wilson*, 295 Kan. 605, 621, 289 P.3d 1082 (2012). We also affirmed a district court's decision that prior crime evidence was not prejudicial when there was no indication the jury would have been confused that the defendant was being prosecuted for the prior crime rather than the charged crime. *State v. Lloyd*, 299 Kan. 620, 640, 325 P.3d 1122 (2014).

Here, in a pretrial motion, the State moved to admit the following: (1) evidence of sexual misconduct committed by Perez against each alleged victim and against two other minor females to prove intent, motive, plan, and identity; (2) evidence of the deaths of Mona, Lindsey, Brian, and Jennifer and evidence as to how each of their life insurance policies were obtained and distributed to prove motive; and (3) evidence that Perez used alias names and other false identification to prove plan, preparation, and identity.

Perez filed a motion in limine requesting the court prohibit the introduction of any such evidence. In a pretrial motions hearing, the district court granted the State's motion and denied the defense motion after concluding that the evidence was relevant and material and that its probative value outweighed any potential prejudice.

At trial, the State admitted this evidence through the testimony of various witnesses over Perez' objections. After the parties finished presenting evidence, the

21

district court provided the following limiting instructions with regard to the prior crime evidence:

"Instruction No. 6: Evidence has been admitted tending to prove that the defendant was convicted in federal court following his arrest in Tennessee. This evidence may be considered solely for the purpose of proving the defendant's absence from the family and the effect, if any, his absence had on family members.

"Instruction No. 7: Evidence has been admitted tending to prove that the defendant committed crimes of a sexual nature, other than the present sex crimes charged. This evidence may be considered solely for the purpose of proving the relationship of the parties and defendant's motive, intent, preparation, plan, knowledge, propensity, absence of mistake or accident.

"Instruction No. 8: Evidence has been admitted relating to the deaths of Mona Griffith, Lindsey Griffith, Jim Chance, Brian Hughes, and Jennifer Hutson and the insurance proceeds that resulted from the deaths. This evidence may be considered solely to explain the relationship of the parties and the parties' state of mind.

"Additionally, as to the death of Mona Griffith and the proceeds from her life insurance policy, this evidence may also be considered to prove the defendant's motive, premeditation, and intent."

Perez presents only one sentence to support his claim that the district court erred. He argues that "[t]he jury would have judged Mr. Perez much more harshly, and given little credence to his defense, based upon the overwhelming evidence of uncharged crimes."

The district court did not abuse its discretion when it decided the prior crime evidence was more probative than it was prejudicial. The circumstances of the other deaths and insurance payments were of the same character as the circumstances surrounding the death of Trish and contributed to the State's theory that Perez killed Trish

22

for the insurance proceeds. In addition, evidence of Perez' previous fraud helped to show plan, preparation, and identity. Finally, the evidence of other sex crimes was highly probative of the State's charges against Perez for sex crimes committed against E.H. and S.H. because the evidence was of the same character and in some cases involved the same victims.

Furthermore, the district court provided limiting instructions that ensured the jury considered the prior crime evidence for its intended purpose and nothing else. Appellate courts presume that juries follow the instructions given. *State v. Becker*, 290 Kan. 842, 856, 235 P.3d 424 (2010). Because Perez points to nothing that suggests they did otherwise, Perez' argument that the jury "judged [him] much more harshly" and "g[ave] little credence to his defense, based upon the overwhelming evidence of uncharged crimes" is unpersuasive.

We conclude that the district court did not abuse its discretion when it held that the probative value of the prior crime evidence outweighed any potential prejudice.

*Limiting Instructions*

Perez claims for the first time on appeal that two of the three limiting instructions regarding the prior crime evidence created reversible error.

When an instructional error is raised for the first time on appeal, this court reviews whether the instruction was clearly erroneous. *State v. Solis*, 305 Kan. 55, 65, 378 P.3d 532 (2016). "To establish a clearly erroneous instruction error, the defendant must firmly convince the court the jury would have reached a different result without the error." 305 Kan. at 65.

23

Evidence that the defendant committed prior crimes or civil wrongs is inadmissible to show the defendant's propensity to commit the charged crime. K.S.A. 2015 Supp. 60-455(a). The evidence is admissible to prove some other relevant fact, such as the defendant's motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident or modus operandi. K.S.A. 2015 Supp. 60-455(b), (c). Because the evidence is not admissible to show propensity, when it is admitted, the trial judge must provide a limiting instruction to ensure that the jury does not consider it for propensity purposes. *State v. Gunby*, 282 Kan. 39, 58, 144 P.3d 647 (2006).

The rules are different when the defendant is charged with a sex crime and the State wishes to introduce evidence of prior sexual misconduct. This evidence is admissible to be considered for any matter to which it is relevant and probative, including propensity. K.S.A. 2015 Supp. 60-455(d); *State v. Smith*, 299 Kan. 962, 970, 327 P.3d 441 (2014). Because the evidence is admissible for any purpose, no limiting instruction is required regarding prior sexual misconduct when the defendant is charged with a sex crime. *State v. Prine*, 297 Kan. 460, 479, 303 P.3d 662 (2013).

Here, Perez challenges two different limiting instructions. We address each in turn.

1. *Instruction regarding prior sex crimes*

Perez challenges the following instruction:

> "Instruction No. 7: Evidence has been admitted tending to prove that the
> defendant committed crimes of a sexual nature, other than the present sex crimes
> charged. This evidence may be considered solely for the purpose of proving the
> relationship of the parties and defendant's motive, intent, preparation, plan, knowledge,
> propensity, absence of mistake or accident."

24

Perez contends that it was error to instruct the jury to consider the evidence for purposes of "propensity" instead of "propensity to commit a charged sex offense" because evidence of prior sexual misconduct is not admissible to show a defendant's propensity to commit a crime that is not a sex offense. He claims the error was clearly erroneous because it allowed the jury to consider the sexual misconduct as tending to show a propensity to commit the other, nonsex crime—first-degree premeditated murder.

The State argues that the instruction here was adequate because the reference to propensity was included in an instruction that was tailored toward the jury's consideration of sex crime evidence only. The State implies that the jury understood that the prior crime evidence was only admissible to show a defendant's propensity to commit other sex crimes.

We agree with the State. While an explicit instruction to consider the prior sex crimes only for propensity to commit other sex crimes would have improved the clarity of this instruction, the omission of such specificity did not render the instruction clearly erroneous. The instruction dealt only with evidence of previous sex crimes, referenced only "the present sex crimes charged," and was offered between two instructions that dealt with prior crimes of an entirely different nature. We conclude that this resulted in an instruction that offered adequate direction to the jury that the prior sex crime evidence was admissible for propensity purposes on other sex crimes only. The defendant has failed to firmly convince us that the jury would have reached a different result had the instruction been more specific. See *Solis*, 305 Kan. at 65. Therefore, the limiting instruction was not clearly erroneous.

2. *Instruction regarding prior deaths and insurance payouts*

Next, Perez argues that the jury instruction regarding deaths of other group members and the proceeds of Mona's insurance policy was "inadequate" because the

25

references to "relationship" and "state of mind" suggested that the jury could consider the evidence for propensity purposes. Because there was evidence that Trish's death was a suicide, Perez argues, "there is a real possibility that a jury properly instructed regarding propensity would not have convicted [him] of premeditated murder."

The instruction was as follows:

"Instruction No. 8:  Evidence has been admitted relating to the deaths of Mona Griffith, Lindsey Griffith, Jim Chance, Brian Hughes, and Jennifer Hutson and the insurance proceeds that resulted from the deaths. This evidence may be considered solely to explain the relationship of the parties and the parties' state of mind.

"Additionally, as to the death of Mona Griffith and the proceeds from her life insurance policy, this evidence may also be considered to prove the defendant's motive, premeditation, and intent."

Perez has not shown error. Perez offers no explanation for why the terms "relationship" and "state of mind" suggest that the jury may consider evidence for propensity purposes. The pattern jury instruction indicates that a trial court may use any nonpropensity descriptor. See PIK Crim. 4th 51.03. In light of Perez' failure to explain how these terms suggest propensity, he has not shown that the instruction was clearly erroneous.

*Cumulative Error*

Perez argues that cumulative error denied him a fair trial and requires reversal of his convictions.

When a party argues that the cumulative impact of alleged errors is so great that they result in an unfair trial, this court aggregates all the errors and, even if those errors

26

individually would be considered harmless, analyzes whether their cumulative effect is so great that they collectively cannot be determined to be harmless. *State v. King*, 297 Kan. 955, 986, 305 P.3d 641 (2013). In undertaking such an analysis, this court reviews the entire record and exercises unlimited review. *State v. Cruz*, 297 Kan. 1048, 1073-74, 307 P.3d 199 (2013). One error is insufficient to support reversal under the cumulative error doctrine. *State v. Novotny*, 297 Kan. 1174, 1191, 307 P.3d 1278 (2013). As we assumed one error here with regard to the admission of Goodwyn's testimony, it alone is insufficient to support reversal as cumulative error.

CONCLUSION

The judgment of the district court is affirmed.

27